[No. A079671. First Dist., Div. Five. Sept. 21, 1998.]

ROBERT HALF INTERNATIONAL, INC., Plaintiff and Appellant, v. FRANCHISE TAX BOARD, Defendant and Respondent.

## COUNSEL

Heller, Ehrman, White & McAuliffe, Glenn A. Smith and Teresa A. Maloney for Plaintiff and Appellant.

Daniel E. Lungren, Attorney General, and Julian O. Standen, Deputy Attorney General, for Defendant and Respondent.

## OPINION

**CHAMPLIN, J.**[*]—Robert Half International, Inc., appeals from a judgment entered after the trial court granted summary judgment to respondent Franchise Tax Board (FTB). Appellant contends the trial court erred when it ruled appellant was not entitled to deduct against its California corporate franchise tax a "nonbusiness" loss that it had incurred. We agree the court interpreted the applicable statue incorrectly and will reverse the judgment.

### I. FACTUAL AND PROCEDURAL BACKGROUND

At the time of the events giving rise to this case, appellant was known as Boothe Financial Corporation. Accordingly, for the remainder of this opinion, we will refer to appellant as Boothe.

In January 1980, Boothe acquired in a statutory merger the assets of an entity known as the IDS Realty Trust. Following the merger, Boothe's principal business was real estate development, and the leasing and sale of computer and other equipment.

Pursuant to the terms of the merger, Boothe assumed the obligation to issue its own shares under a warrant[1] that was held by a third party, Investors Diversified Services, Inc. As a result of the merger, the warrant became a right to purchase 480,000 shares of Boothe's stock, which would represent approximately 21 percent of the voting power of the corporation. Subsequently, Investors Diversified transferred the warrant to its parent, the Alleghany Corporation.

Boothe's shares were publicly traded, and Boothe's chairman and chief executive officer believed that the existence of the warrant had an unsettling

---

[*]Judge of the Napa Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1]A warrant is simply an option to purchase the shares of a corporation at a specified price and for a specified period of time. It differs from an option in that it is issued in the form of a security and is normally intended to be traded in the public market. (See 1 Marsh's Cal. Corporation Law (3d ed. 1997) § 6.22, p. 363.)

effect on the market for Boothe's shares because the owner could, by exercising it, own a substantial and perhaps controlling interest in the company. Accordingly, in February 1981, Boothe paid Alleghany $7.5 million to repurchase and cancel the warrant.

Boothe was domiciled in California, so on its 1981 corporate franchise tax return, it deducted the entire $7.5 million payment as a "nonbusiness" loss within the meaning of Revenue and Taxation Code[2] section 25120, subdivision (d), that was allocable solely to its California source income. FTB audited Boothe's return and determined the payment was a "business" loss under section 25120, subdivision (a) that should have been apportioned among the various states in which Boothe did business. Accordingly, FTB assessed additional tax against Boothe. Boothe paid the tax and, after pursuing the appropriate administrative remedies, filed the present action seeking a refund.

Boothe and FTB filed cross-motions for summary judgment in which they asked the court to determine the character of the $7.5 million payment. The court ruled the payment was a "business" loss within the meaning of section 25120, subdivision (a) and that the FTB had acted correctly. This appeal followed.

## II. DISCUSSION

When a corporation conducts business in more than one state, it is necessary to determine how much of its income and losses are attributable to one taxing state as opposed to another. To accomplish this task in a fair and predictable manner, California and 22 other states have adopted the Uniform Division of Income for Tax Purposes Act (UDITPA) (§ 25120 et seq.). (See Table of Jurisdictions Wherein Act Has Been Adopted, 62 West's Ann. Rev. & Tax. Code (1998 pocket pt.) preceding ˋ§ 25120, p. 232; see also *Times Mirror Co.* v. *Franchise Tax Bd.* (1980) 102 Cal.App.3d 872, 874 [162 Cal.Rptr. 630] (*Times Mirror*).) Under UDITPA, a taxpayer's income is treated differently depending upon its character. Specifically, "business income" is allocated among the various states from which the income is derived through a formula based upon the property, sales, and payroll of the taxpayer. (Former § 25128; see *Willamette Industries, Inc.* v. *Franchise Tax Bd.* (1995) 33 Cal.App.4th 1242, 1246 [39 Cal.Rptr.2d 757].) "[N]onbusiness income" by contrast, generally[3] is allocated in full to the state in which the taxpayer is domiciled. (§§ 25123-25127; see also *Willamette, supra,* 33 Cal.App.4th at p. 1246.)

---

[2]All subsequent statutory references are to the Revenue and Taxation Code.

[3]Section 25137 sets forth a few special rules that do not apply under the facts of this case.

Under this statutory scheme, the definitions of "business" and "nonbusiness" income are critical. In California, those definitions are set forth in section 25120 which states, in part, "(a) 'Business income' means income arising from transactions and activity in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations. [¶] . . . [¶] (d) 'Nonbusiness income' means all income other than business income."

The issue in this case is whether the trial court correctly ruled that Boothe's payment of $7.5 million to cancel the warrant was a "business" loss within the meaning of section 25120, subdivision (a). The resolution of this issue has been simplified because the parties agree on several significant points. First, both agree that losses are treated the same way as income; i.e., business losses are apportioned among the states in which business is done, while nonbusiness losses are allocated in full to the state of commercial domicile.

Second, the parties agree that the definition of business income set forth in section 25120, subdivision (a) in fact contains two separate tests: a "transactional" test contained in the 16 words that follow the word "means," and a more focused "functional" test that is set forth in the last 26 words of the statute following the word "includes." Furthermore, the parties agree that the loss at issue does *not* qualify as a business loss under the transactional test.

Third, the parties agree that the correct characterization of the loss at issue presents a question of law which we can decide de novo on appeal.

■ Thus, the pivotal issue in this case is relatively narrow, i.e., was Boothe's payment of $7.5 million to cancel the warrant a "business" loss under the functional test set forth in section 25120, subdivision (a). Phrased in the language of the statute, the question is whether the loss Boothe incurred when it repurchased the warrant arose from "tangible [or] intangible property . . . the acquisition, management, and disposition of [which] constitute[d an] integral part[] of [its] regular trade or business operations." (*Ibid.*) Clearly the answer is no because Boothe's acquisition of the warrant was not an "integral part[] of [its] *regular* trade or business operations." (Italics added.)

The evidence presented to the trial court showed that Boothe's principal business was the development of real estate, and the leasing and sale of computer and other equipment. Boothe was not in the business of acquiring warrants, and it characterized the acquisition in question as an "extraordinary and non-recurring" event. More critically, the warrant entitled the

holder to purchase a substantial (and perhaps controlling) block of Boothe's stock at a below-market price and, thus, had an unsettling effect on the market for Boothe's shares. Since the existence of such a possibility was itself an extraordinary event, it follows that the loss Boothe incurred to negate that possibility was also an extraordinary event that fell outside of its regular trade or business operations. We conclude Boothe's loss cannot reasonably be interpreted as a business loss within the meaning of the functional test set forth in section 25120, subdivision (a).[4]

The result we reach here is consistent with the holding of another state that faced a similar question. In *Phillips Petroleum* v. *Dept. of Revenue* (Iowa 1993) 511 N.W.2d 608 (*Phillips*), the taxpayer, Phillips, had been threatened by a corporate takeover, so it borrowed money to repurchase a substantial number of its shares; to repay the amount it had borrowed, Phillips sold some oil-and-gas-producing properties. The Iowa taxing authorities concluded the money obtained from the sale was business income; but the Iowa Supreme Court reversed, explaining that the "disposition of assets here was irregular, not only in its scope, but also in its nature. It did not occur as an accommodation of Phillips'[s] petroleum production. Rather the transaction was aimed at a wholesale restructuring of the corporation's capital structure." (*Id.* at p. 611.)

Here, as in *Phillips,* Boothe faced a problem that was unusual in its nature and scope, i.e., an unsettled market for its shares due to the existence of a warrant that made it possible for an outsider to purchase a large (and possibly controlling) block of Boothe's stock at a below-market price. Like the court in *Phillips*, we conclude the money Boothe spent to extricate itself from that problem was also outside the scope of its regular business operations and, thus, did not constitute a business loss within the meaning of section 25120, subdivision (a).

The various arguments FTB advances when urging the contrary conclusion are unpersuasive. First, FTB argues that under a regulation it enacted to supplement section 25120, any income that arises "from a transaction which contributes to the taxpayer's business operations is business income." FTB

---

[4]Because the issue is not presented in this case, we state no opinion on whether income that arises when a taxpayer sells property that it used in its regular trade or business operations should be characterized as business or nonbusiness. (Cf. *Laurel Pipe Line Co.* v. *Com.* (1994) 537 Pa. 205 [642 A.2d 472, 475] [nonbusiness income] with *Texaco-Cities Service Pipeline* v. *McGaw* (1998) 182 Ill.2d 262 [230 Ill.Dec. 991, 695 N.E.2d 481, 484-487] [business income].) We also state no opinion on the corollary rule that is applied in states that have adopted the latter position; i.e., that the infrequency or extraordinary nature of the sale is irrelevant. (See *District of Columbia* v. *Pierce Associates* (App.D.C. 1983) 462 A.2d 1129, 1131.)

contends the loss at issue qualifies under this test because the repurchase of the warrant "contributed to Boothe's business operations . . . ." In an effort to support this argument, FTB cites evidence that showed one of the reasons Boothe decided to repurchase the warrant was so it could pursue other investment opportunities.

We reject this argument because it proves too much. While the regulation upon which FTB relies (Cal. Code Regs., tit. 18, § 25120, subd. (a) (Regulations))[5] does suggest a broad definition of the term business income, it cannot be interpreted as broadly as FTB contends. Under the test FTB proposes, *all* of a corporation's income would be business income because all income contributes to a corporation's business operations in some way. Such an interpretation is inconsistent with the fact that section 25120 itself creates two classes of income which are subjected to different tax treatments. Indeed, the very regulation upon which FTB relies contradicts FTB's argument because it sets forth several examples of business activity that arguably "contribute[] to the taxpayer's business operations," but which are provided as illustrations of "nonbusiness" income. (See Regs., § 25120, subd. (c)(1), examples (D), (E), and (G).)

Next, FTB contends the loss at issue must be characterized as a "business" loss under the reasoning of *Times Mirror*. The issue in *Times Mirror* was how capital gains income received by a parent corporation when it sold the stock of a subsidiary corporation should be characterized. The evidence in that case showed the parent Times Mirror had, in the years preceding the event in question, obtained control of 36 different corporations and had sold control of 10 corporations. (102 Cal.App.3d at p. 876, fn. 3.) Furthermore, the parties had *stipulated* that Times Mirror had acquired the subsidiary, the Sun Company " 'to further the regular business operations of the unitary group of businesses headed by Times Mirror . . . . During the time it was owned by Times Mirror . . . . The Sun Company was managed as an integral part of the regular business operations of Times Mirror . . . .' " (*Id.* at p. 875.) Based on this record, the appellate court had no difficulty in concluding that income obtained from the sale was business income. (*Id.* at pp. 877-878.). Indeed, given the fact that the parties had stipulated that the income had arisen in the course of Times Mirror's regular business operations, "It would stand the stipulation on its head to say the contrary." (*Id.* at p. 877.)

---

[5] Regulations, section 25120, subdivision (a) states in part, "[Par. 3] . . . In general all transactions and activities of the taxpayer which are dependent upon or contribute to the operations of the taxpayer's economic enterprise as a whole constitute the taxpayer's trade or business and will be transactions and activity arising in the regular course of, and will constitute integral parts of, a trade or business."

FTB interprets *Times Mirror* as meaning that income obtained by a parent corporation when it alters its capital structure must be characterized as business income. However, in our view, the case simply means that when parties stipulate that a corporation acquired and operated another corporation as part of its regular business operations, the sale of that corporation results in business income. *Times Mirror* is not controlling here.

Finally, FTB contends its position is supported by a decision issued by the State Board of Equalization, Appeal of DPF, Inc:, [1978-1981 Transfer Binder] California Tax Reporter (CCH) paragraph 206-430, page 14,965-36 (Oct. 28, 1980) (*DPF*). In that case, the taxpayer had issued debentures and deducted the interest as a business deduction; when interest rates increased, the value of the debentures decreased so the taxpayer repurchased some of them, and in doing so, realized a taxable gain. (*Id.* at p. 14,965-37.) The State Board of Equalization ruled that the income the taxpayer obtained was business income, reasoning as follows: "The gains here resulted from [taxpayer]'s repurchases of some of its own outstanding debentures. Although [taxpayer] undoubtedly examined these transactions at least partly on their merits as investments, they were in reality not merely passive investments, but were active reductions of outstanding corporate liabilities for interest and principal payments. . . . [W]e think the acquisition, management and disposition of its own securities by a taxpayer engaged in a single trade or business constitute integral parts of that trade or business, giving rise to business income." (*Id.* at pp. 14,965-37 to 14,965-38.)

FTB has not clearly articulated the reason it believes *DPF* is relevant; but it seems to argue the case stands for the proposition that when a corporation makes money by buying or selling its own stock, business income results. That may be true under some circumstances, but it is not necessarily true in others. The regulations FTB has adopted make clear that similar types of income can be characterized differently depending upon the precise circumstances of the transaction involved. (Compare Regs., § 25120, subd. (c)(1), example (C) [Income received by a corporation when it leased a portion of its corporate headquarters is business income.] with Regs., § 25120, subd. (c)(1), example (E) [Income received by a corporation when it leased a portion of its corporate headquarters is nonbusiness income.].) The same principle applies here. As we have explained above, the evidence presented to the trial court showed that Boothe's purchase of the warrant was motivated by an extraordinary event that was outside the scope of its regular business activities. Under the clear language of section 25120, subdivisions (a) and (d), the loss Boothe incurred, thus, constituted nonbusiness income. By contrast, nothing in *DPF* suggests the taxpayer was faced with an extraordinary event that was outside the scope of its normal business activities. The case is simply distinguishable.

We conclude the trial court erred when it ruled the loss Boothe incurred was a business loss within the meaning of section 25120, subdivision (a). The loss should have been characterized as a nonbusiness loss within the meaning of section 25120, subdivision (d).[6]

III. DISPOSITION

The judgment is reversed, and the matter is remanded to the trial court for further proceedings consistent with this opinion.

Jones, P. J., and Haning, J., concurred.

A petition for a rehearing was denied October 16, 1998, and the opinion was modified to read as printed above.

---

[6]Having reached this conclusion, we need not reach the alternate arguments Boothe has advanced; i.e., that the warrant was not "tangible or intangible" property; that it did not acquire, manage, or dispose of the warrant as those terms are statutorily defined; and that the loss must be characterized as a business loss under analogous federal tax statutes.