90 Cal.Rptr.2d 768 (1999)
76 Cal.App.4th 914
HOECHST CELANESE CORPORATION, Plaintiff and Appellant,
v.
FRANCHISE TAX BOARD, Defendant and Respondent.
No. C030702.
Court of Appeal, Third District.
December 3, 1999.
As Modified on Denial of Rehearing January 3, 2000.
Review Granted March 1, 2000.
*770 Morrison & Foerster, Eric J. Coffill and Lisa R. Brenner, Sacramento, for Plaintiff and Appellant.
Bill Lockyer, Attorney General, Lawrence K. Keethe, Supervising Deputy Attorney General, and George C. Spanos, Deputy Attorney General, for Defendant and Respondent.
Paull Mines and Anne E. Miller for Multistate Tax Commission, as Amici Curiae on behalf of Defendant and Respondent.
*769 CALLAHAN, J.
Plaintiff Hoechst Celanese Corporation (hereafter Celanese), a Delaware corporation, seeks refund of $292,142 in corporate franchise taxes plus interest paid for the year ending December 31, 1985. The trial court denied the refund, finding the apportioned share of a $388 million pension reversion to Celanese from a qualified pension trust constituted business income under the Uniform Division of Income for Tax Purposes Act (UDITPA). (Rev. & Tax Code, § 25120 et seq.)[1]
On appeal, Celanese contends there is no separate, functional test for business income under section 25120, subdivision (a), and, in any event, the pension reversion does not satisfy the functional test, even if it applies. Celanese also argues taxation of the pension reversion is unconstitutional.[2]
*771 We conclude section 25120, subdivision (a) includes both a transactional test and a functional test to determine what constitutes business income for purposes of the UDITPA. In this case, however, the record does not support a determination the pension reversion was business income under either test. We therefore reverse the judgment, and need not address Celanese's constitutional challenge.

DISCUSSION

I

The UDITPA
California employs the unitary business principle and formula apportionment in assessing franchise taxes against corporations like Celanese which do business both inside and outside the state. (Container Corp. v. Franchise Tax Bd. (1983) 463 U.S. 159, 162-163, 103 S.Ct. 2933, 2939, 77 L.Ed.2d 545, 551.) The challenge is for states to divide the income subject to tax in an equitable manner.
State corporate tax laws distinguished between income to be specifically allocated and income to be apportioned "[f]rom the beginning." (Peters, The Distinction Between Business Income and Nonbusiness Income (1973) So. Cal. Tax Inst. 251, 252 (hereafter Peters).) As a result of efforts by the Council of State Governments and other interested groups, the National Conference of Commissioners on Uniform State Laws and the American Bar Association approved the UDITPA in 1957. (7A, Pt. 1, West's U.Laws Ann. (1999) UDIPA, Hist. Note, p. 356, Prefatory Note, p. 357.) The California Legislature adopted the UDITPA almost verbatim nine years later. (Keesling & Warren, California's Uniform Division of Income for Tax Purposes Act (1967) 15 UCLA L.Rev. 156 (hereafter Keesling & Warren); Stats. 1966, ch. 2, § 7, p. 177.)[3]
The objectives of the UDITPA were twofold: "(1) to promote uniformity in allocation practices among the 38 states which impose taxes on or measured by the income of corporations, and (2) to relieve the pressure for congressional legislation in this field." (Keesling & Warren, supra, p. 156.)
The UDITPA treats the corporate taxpayer's income differently depending on its character. "Specifically, `business income' is [apportioned] among the various states from which the income is derived through a formula based upon the property, sales, and payroll of the taxpayer. [Citations.] `[Nonbusiness income' by contrast, generally is allocated in full to the state in which the taxpayer is domiciled. [Citations.] [¶] Under this statutory scheme, the definitions of `business' and `nonbusiness' income are critical." (Robert Half Internal, Inc. v. Franchise Tax Bd., supra, 66 Cal.App.4th at pp. 1023-1024, 78 Cal.Rptr.2d 453, fn. omitted.)
In California, section 25120, subdivision (a) defines "business income" as "income *772 arising from transactions and activity in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations."
"Nonbusiness income" is defined in section 25120, subdivision (d) as "all income other than business income." Nonbusiness income consisting of interest and dividends, or capital gains from the sale of intangible personal property, is allocable to California only if the taxpayer's commercial domicile is in this state. (§§ 25125, subd. (c), 25126.)

II

Factual and Procedural Background
After unsuccessfully pursuing its refund claims through the administrative process, Celanese paid the tax and interest, and filed a complaint for refund in Sacramento County Superior Court. The parties submitted a joint stipulation of facts and numerous exhibits on the first day of the court trial. Celanese called as its only witness Richard S. Payne, who served as a senior tax attorney and corporate officer between 1969 and 1988. The key facts are undisputed.
Celanese manufactures and sells a diversified line of chemicals, fibers, and specialty products. It is a Delaware corporation, with its principal place of business in New Jersey. In 1985, New York was Celanese's commercial domicile.
The corporation conducts business operations throughout the United States and the world. It has filed franchise tax returns in California since the late 1960's. For purposes of franchise taxes in 1985, Celanese's California apportionment factor was 1.2182 percent, and 1.2182 percent of the total business income of its worldwide unitary business was apportioned to California.
"Celanese created and maintained a qualified defined benefit plan known as the Celanese Retirement Income Plan (`Plan'), which covered both active and retired employees. Celanese also created a tax exempt trust known as the Celanese Retirement Income Plan Trust (`Trust') to receive and invest Celanese's contributions. The [P]lan was a qualified plan under Internal Revenue Code section 401(a), and the Trust was an exempt trust under Internal Revenue Code section 501(a)...." Celanese drew its contributions to the Celanese Retirement Income Plan (Plan) from general business earnings. It claimed deductions for those contributions on its federal tax returns and on its California franchise tax returns.
At no time since the first retirement plans originated in 1947 has Celanese shown the assets of the various versions of the Plan or the Celanese Retirement Income Plan Trust (Trust) on its balance sheet. Nor have the earnings from any of the versions of the Trust ever appeared on its books of account.
Celanese maintained the Plan as an inducement to retain its current employees and to attract other qualified employees. Plan members were entitled to prescribed benefits under the Plan, and no more. Celanese used actuarial gains to reduce its future contributions to the Trust, not to increase benefits. However, at no time prior to the satisfaction of all Plan liabilities could any part of the Trust funds be used for purposes other than the exclusive benefit of the Plan members or their beneficiaries.
Celanese administered the Plan and Trust through its administrative and investment committees. The board of directors appointed committee members from time to time as needed.
The administrative committee administered the paperwork generated by the Plan. Membership included corporate officers and nonofficers.
*773 The investment committee supervised and reviewed the financial operations of the Trust. Membership included Celanese's chief financial officer, controller, and vice president of human resources. The investment committee appointed the investment managers who were assigned the task of achieving the highest possible return on invested capital.
The board of directors received reports on the condition of the Plan and Trust. It had the power to appoint and change the trustee. However, the trustee  not Celanese  held title to the investments in the Trust.
Celanese revised its pension investment strategy at the end of 1978. As a result, the Plan investments exceeded actuarial expectations between December 1978 and December 1982. The gains created a large surplus of Trust funds. Management urged "it would be more beneficial for [Celanese] and its stockholders to use the cash surplus from [the Plan] for corporate purposes than to leave it in the [P]lan."
The board of directors voted to implement a proposed pension plan reversion. The purpose for seeking termination of the Plan and Trust, and obtaining the reversion, was to avoid surplus in the Plan being used in a takeover bid to acquire Celanese stock.
"Effective January 1, 1984, the Plan and Trust were divided into two plans and two trusts, which generally contained the same Plan and Trust provisions generally described above. The Celanese Retirement Income Plan (`CRIP') covered active employees, and the Celanese Retirement Security Plan (`CRSP') covered retired employees. Both plans were qualified benefit plans under Internal Revenue Code section 401(a).
"... Concurrent with the split-up of the Plan, the Trust agreement between Celanese and the Trustee was amended to divide the Trust into two separate trusts: The Celanese Retirement Security Plan Trust (`CRSP Trust') and the Celanese Retirement Income Plan Trust (`CRIP Trust'). Both trusts were exempt under Internal Revenue Code section 501(a). By Resolution of the Celanese's Board of Directors, the assets of the Trust were allocated between the CRIP Trust and the CRSP Trust ... to ensure that all benefits accrued under the CRIP and the CRSP were as fully funded immediately after the transfer as they were immediately before the transfer, as required by Internal Revenue Code section 414(l)."
Celanese split the Plan into the Celanese Retirement Income Plan Trust (CRIP Trust) and the Celanese Retirement Security Plan Trust (CRSP Trust) to satisfy Internal Revenue Service and Internal Revenue Code requirements. It considered the option of terminating the Plan altogether if the Internal Revenue Service (IRS) and Pension Benefits Guarantee Corporation did not approve the reversion.
The Celanese Retirement Security Plan (CRSP) and the CRSP Trust were terminated after the CRSP Trust purchased annuities for retirees at the cost of $110 million. Once CRSP obtained necessary approvals and satisfied all its obligations, it paid Celanese $388.8 million. The payment represented CRSP Trust assets in excess of liabilities. Celanese used the pension reversion funds to carry out a stock redemption program to reduce the number of outstanding shares.
Celanese properly reported the $388.8 million as miscellaneous income on its 1985 federal tax return. It also reported the pension reversion gain as taxable income on the 1985 tax return for New York, its commercial domicile.
In its statement of decision, the court found that section 25120, subdivision (a) provides for two alternative, independent tests to classify business income: the transactional test and the functional test. The court found the pension reversion represented business income under the functional test, but not the transactional test. *774 Finally, the court found the pension trust served an operational function for Celanese, and taxation of gain on the pension reversion did not violate the commerce and due process clauses of the United States Constitution.

III

Standard of Review
The taxpayer has the burden of proof in an action for tax refund, and must "affirmatively establish the right to a refund ... by a preponderance of the evidence." (Consolidated Accessories Corp. v. Franchise Tax Board (1984) 161 Cal. App.3d 1036, 1039, 208 Cal.Rptr. 74.) We must accept the trial court's factual findings if they are supported by substantial evidence. (AM. Castle & Co. v. Franchise Tax Bd. (1995) 36 Cal.App.4th 1794, 1801, 43 Cal.Rptr.2d 340.) However, to the extent the issues in this case involve application of a taxing statute to undisputed facts, we are confronted with questions of law and are not bound by the findings of the trial court. (Consolidated Accessories Corp. v. Franchise Tax Board, supra, at p. 1039, 208 Cal.Rptr. 74.)

IV

Tests to Identify "Business Income" Under the UDITPA
As we explained, the UDITPA defines business income as "income arising from transactions and activity in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations." (§ 25120, subd. (a), emphasis added.) The pivotal issue in this appeal is what test or tests the Franchise Tax Board (FTB) may use to identify business income under this statute. No published California appellate decision addresses the question directly.[4]
Celanese contends "there is no separate functional test for business income, and under the plain meaning of section 25120, subdivision (a), business income does not include Celanese's once-in-a-corporate-lifetime pension reversion." (Underscoring in original.) Celanese asserts that "[t]he primary and overriding thrust of the statute is that `business income' means income arising in the regular course of the taxpayer's trade or business. It follows that if income does not arise from a transaction and activity in the regular course of the taxpayer's trade or business, it is not `business income.' To be sure, the statute contains, as a specific illustration of the primary definition, the provision that `business income' includes income from tangible and intangible property, when the acquisition, management and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations. But this illustrative elaboration of the primary definition does not enlarge its scope. Indeed, the second clause reinforces the scope of the first clause by providing that income from property is `business income' only when the acquisition, management, and disposition of the property 'constitute integral parts of the taxpayer's trade or business operations.'" (Emphasis in original.)
The FTB says the functional test for business income is based on the second phrase in section 25120, subdivision (a). According to its argument, the statutory language "applies to income associated with an asset which plays an integral role in the operations of the taxpayer's regular trade or business." The transaction which generates the income need not be a regular or frequent occurrence; an extraordinary event such as the pension reversion qualifies.
*775 Having carefully reviewed the statutory language, the history and purpose of the UDITPA, and interpretation of its uniform provisions by the FTB and sister states, we conclude section 25120, subdivision (a) provides for both a transactional and a functional test. The transactional test focuses on the transaction or activity which gave rise to the gain or loss, and asks whether it occurred in the regular course of the taxpayer's business. The functional test focuses on the character of the property that generated the income, and asks whether that asset was in integral part of the corporation's regular trade or business operations.
The process of statutory construction begins with an examination of the statutory language. Courts give the words of the statute their ordinary, everyday meaning unless the statute specifically assigns them a special meaning. (Halbeit's Lumber, Inc. v. Lucky Stores, Inc. (1992) 6 Cal.App.4th 1233, 1238, 8 Cal. Rptr.2d 298.) "If the meaning is without ambiguity, doubt, or uncertainty, then the language controls." (Id. at p. 1239, 8 Cal. Rptr.2d 298.) If, however, the meaning of the words is not clear, "courts must take the second step and refer to the legislative history." (Ibid.)
The fact section 25120 is part of a uniform act administered by a state agency means there are aids to construction in addition to traditional legislative history. Although FTB decisions are not binding on this court, we consider that agency's interpretation of the statute in light of the agency's expertise and technical knowledge, thorough analysis of the issues, and consistency over time. (Yamaha Corp. v. State Bd. of Equalization (1998) 19 Cal.4th 1, 7, 10, 14-15, 78 Cal.Rptr.2d 1, 960 P.2d 1031.)
We also examine case law from other states which have adopted a similar definition of business income. Indeed, the UDITPA states that "`[t]his act shall be so construed as to effectuate its general purpose to make uniform the law of those states which enact it.' (§ 25138.)" (Times Mirror Co. v. Franchise Tax Bd. (1980) 102 Cal.App.3d 872, 881, 162 Cal.Rptr. 630, emphasis in original; see, e.g., McDonnell Douglas Corp. v. Franchise Tax Bd. (1994) 26 Cal.App.4th 1789, 1794-1796, 33 Cal. Rptr.2d 129.)
Here, each party insists the meaning of section 25120, subdivision (a) is clear; they disagree whether that plain language gives rise to one or two tests for business income. The disagreement focuses on whether the word "includes" is a word of limitation or a word of enlargement. (See Muller v. Automobile Club of So. California (1998) 61 Cal.App.4th 431, 444-445, 71 Cal.Rptr.2d 573, and People v. Western Air Lines, Inc. (1954) 42 Cal.2d 621, 639, 268 P.2d 723.)
Other jurisdictions have addressed the same question in recent years, with varying outcomes. "Some state supreme courts read the second clause of the UDITPA as simply modifying the first clause and therefore hold that the definition of business income under UDITPA contains only the transactional test. [Citations.] However, after these decisions, the legislatures of those states promptly amended their respective tax statutes to explicitly include the functional test within their definition of business income. [Citations.] [¶] Other UDITPA states, however, recognized the second clause as encompassing a second independent test known as the `functional test.' [Citations.] These states concluded either that the plain language of UDITPA includes the functional test or that the definition of business income is ambiguous, and therefore the respective state supreme courts had the right to construe the statute to include the functional test." (Polaroid, supra, 349 N.C. at pp. 295-296, 507 S.E.2d at p. 289.)
We agree with Polaroid's analysis of the statutory language, and conclude the plain language of section 25120, subdivision (a) encompasses both the transactional test and the functional test. "[G]rammatically *776 speaking, business income constitutes the subject of the sentence, which is thereafter defined by two independent clauses, each with its own verb and subsequent definitional language. In fact, the statute could grammatically be read as stating: `Business income means income arising from transactions and activity in the regular course of the corporation's trade or business, and [business income] includes income from tangible and intangible property....' That is, [section 25120, subdivision (a) ] does not contain a misplaced modifier, but rather utilizes a compound predicate to illustrate that `business income' includes the definitions set forth in both the first and second clauses. [Citations.]" (Polaroid, supra, 349 N.C. at pp. 297-298, 507 S.E.2d at pp. 290-291; accord, Texaco-Cities Serv. Pipeline Co. v. McGaw (1998) 182 Ill.2d 262, 230 Ill.Dec. 991, 695 N.E.2d 481; Laurel Pipe Line Company v. Bd, of Fin. & Revenue (1994) 537 Pa. 205, 642 A.2d 472.)
Our reading of the statute is consistent with the history of the UDITPA. Celanese correctly notes the California Legislature did not draft section 25120; it adopted the definition of business income as part of the UDITPA in 1966. Thus, there is little, if any, California legislative history. However, when California adopts a uniform act, the history of the uniform act becomes significant. (See Abbott Ford, Inc. v. Superior Court (1987) 43 Cal.3d 858, 894-895, 239 Cal.Rptr. 626, 741 P.2d 124 [the fact the Legislature has adopted the words of a uniform act "supports, if not compels" the conclusion it has adopted the purpose and intent of those who drafted that act].)
The UDITPA's definition of business income was patterned after California's long-standing definition of unitary income. (In re Appeal of Borden, Inc. (Feb. 3, 1977) [1971-1978 Transfer Binder] Cal. Tax Reports (CCH) ¶ 205-616, p. 14,897-58 (hereafter Borden); Peters, supra, 1973 So. Cal. Tax Inst, at p. 276; Keesling & Warren, supra, 15 UCLA L.Rev. at pp. 163-164.) "The underlying principle in [the earlier Board of Equalization (hereafter SBE) ] cases is that any income from assets which are integral parts of the unitary business is unitary income. It is appropriate that all returns from property which is developed or acquired and maintained through the resources of and in furtherance of the business should be attributed to the business as a whole. And, with particular reference to assets which have been depreciated or amortized in reduction of unitary income, it is appropriate that gains upon the sale of those assets should be added to the unitary income." (Borden, supra, Cal. Tax Reports, ¶ 205-616 at p. 14,897-58; see, e.g., In re Appeal of Houghton Mifflin Company (March 28, 1946) 3 Cal. Tax Cases 344, 1946 Cal. Tax LEXIS 16.)
In Borden, the Board of Equalization stated that "the continuity between the old and new law suggests that when the Legislature adopted the Uniform Act, it did not anticipate a change in the prior rule that income from assets which are an integral part of the taxpayer's business is subject to apportionment by formula, regardless of whether the income may arise from an occasional or extraordinary transaction." (Borden, supra, Cal. Tax Reports, ¶ 205-616 at pp. 14,897-58-14,897-59.)
Our reading of section 25120, subdivision (a) accords with the SBE's consistent interpretation of the statute. Borden and In re Appeal of Kroehler Manufacturing Co. ((Apr. 6, 1977) Cal. Tax Reports (CCH) [1971-1978 Transfer Binder] ¶ 205-646, p. 14,897-123) (hereafter Kroehler) interpret the statute to include both a transactional and functional test for business income.
In Borden, the SBE considered whether the taxable loss on the sale of goodwill in Borden's liquidation of its California dairy and ice cream operations was "`business income' to be apportioned by formula among California and other states, ... or *777 ... `nonbusiness income' specifically allocable in toto to California," presumably under section 25125, subdivision (a). (Borden, supra, Cal. Tax Reports, 1205-616, at p. 14,897-58.) The SBE looked to prior California law and administrative regulations as the basis for its conclusion section 25120 provided for a functional test. (Borden, supra, at pp. 14,897-58-14,897-59.) It expressly disagreed with the Kansas and New Mexico courts' rejection of the functional test under those states' versions of the UDITPA, noting the rulings were directly contrary to the regulations of the Multistate Tax Commission. (Id. at p. 14,897-59.)
Kroehler involved the question whether rebates paid to the furniture company on liquidation of its qualified pension plan constituted business income subject to apportionment for California tax purposes, or nonbusiness income specifically allocable to its out-of-state domicile. (Kroehler, supra, Cal. Tax Reports, ¶ 205-649, p. 14,897-122.) The SBE applied Borden to conclude the acquisition, maintenance, and disposition of the pension plan constituted integral parts of Kroehler's manufacturing and sales business, thereby satisfying the functional test for business income. (Id. at p. 14,897-123.)
The Legislature has not amended the definition of business income since the UDITPA was adopted, strongly suggesting the SBE decisions accord with legislative intent. (See Coca-Cola Co. v. State Bd. of Equalization (1945) 25 Cal.2d 918, 922, 156 P.2d 1.)
Also persuasive, although not binding, are decisions from other states with similar definitions of business income that have addressed the question now before this court. (Times Mirror Co. v. Franchise Tax Bd., supra, 102 Cal.App.3d at p. 881, 162 Cal.Rptr. 630.) The results are mixed, but the majority of states faced with the issue have concluded the definition of business income encompasses both a transactional and functional test for business income.[5]

V

The Pension Reversion Is Not "Business Income"
Having agreed with the trial court's determination that section 25120, subdivision (a) provides for two tests to determine business income, we now consider whether Celanese's pension reversion constitutes business income under either test.
We explained that the transactional test focuses on the nature of transaction or activity giving rise to the income or loss, and whether it took place in the regular course of the taxpayer's business. Three factors must be considered under the transactional test: "the frequency and regularity of similar transactions, the former practices of the business, and the taxpayer's subsequent use of the income." (Polaroid supra, 349 N.C. at p. 295, 507 S.E.2d at p. 289.)
Here, the reversion of the excess pension funds was the transaction that gave rise to the income, not the operation of the pension plan itself. The record *778 shows Celanese's removal of the surplus funds was an extraordinary  not regular  event, occurring only once in the nearly 20 years Mr. Payne worked for the corporation. As such, the reversion to Celanese did not occur in the "regular course of the taxpayer's trade or business." (§ 25120, subd. (a).) Accordingly, we agree with the trial court's determination the pension reversion was not business income under the transactional test.
Turning to the functional test, the question is whether the gain from the pension reversion arose from "`tangible [or] intangible property ... the acquisition, management, and disposition of [which] constitute] [an] integral part[ ] of [Celanese's] regular trade or business operations.' " (Robert Half Internal, Inc. v. Franchise Tax Bd., supra, 66 Cal.App.4th at p. 1024, 78 Cal.Rptr.2d 453, quoting § 25120, subd. (a).) We conclude it did not.
Celanese argues that if the functional test exists, "income from tangible and intangible property is business income if the acquisition and management and disposition of the property constitute integral parts of the taxpayer's `regular trade or business operations.'" (Underscoring in original.) The FTB responds that "and" should be interpreted as the disjunctive "or" to carry out "the Legislature's obvious intent as gleaned from the context." We decline the FTB's invitation to disregard the plain language of section 25120, subdivision (a) and the UDITPA. The word "and" ordinarily connotes a conjunctive meaning, while the word "or" implies a disjunctive or alternative meaning. (Melamed v. City of Long Beach (1993) 15 Cal.App.4th 70, 79, 18 Cal.Rptr.2d 729.) Moreover, the FTB's reading is inconsistent with the decision in Robert Half Internal, Inc. v. Franchise Tax Bd., supra, 66 Cal.App.4th at pages 1024-1025, 78 Cal. Rptr.2d 453, where the court focused solely on the acquisition of intangible property in finding the loss on repurchase and cancellation of a warrant was not a business loss under the functional test.
The North Carolina Supreme Court provided a more complete analysis of the language of that state's identical statute in Polaroid, noting "that the phrase `acquisition, management, and/or disposition' contemplates the indicia of owning corporate property. [Citation.]" (349 N.C. at p. 301, 507 S.E.2d at pp. 292-293.) Although California does not equate "integral" with "essential" for purposes of determining what constitutes a unitary business (Superior Oil Co. v. Franchise Tax Board (1963) 60 Cal.2d 406, 413-414, 34 Cal.Rptr. 545, 386 P.2d 33), the Polaroid, analysis properly highlights the closeness of the relationship between the asset and the corporation's business operations required under the functional test for business income.
The FTB cites the SBE decision in Kroehler in support of its argument the Celanese pension reversion is taxable as business income under the functional test. However, Kroehler's factual analysis is brief and conclusory, and the SBE's limited findings distinguish it from the case before us. In Kroehler, the taxpayer acquired all the assets of another furniture company, including interest in a pre-ERISA pension plan, to further its business of manufacturing and selling furniture. (Kroehler, supra, Cal. Tax Reports, ¶ 205-649, p. 14,897-123.) It maintained the pension plan to retain and attract employees to perform the required labor. The taxpayer liquidated the pension plan in the course of terminating the entire business operation of its Kentucky subsidiary. The taxpayer, as residuary beneficiary of the pension plan, received the fund surplus as a rebate. (Ibid.)
Here, Celanese did not hold title to the investments in the Trust. Celanese's role was limited to appointing members of the investment committee who, in turn, appointed the fund managers. A trustee held the assets of the Trust, and the individual employees and retirees who participated *779 in the Plan were its beneficiaries. At no time did the assets of the Plan or Trust appear on Celanese balance sheets; nor were the earnings of the Trust reported on the corporation's books of account. Although Celanese used the $388.8 million pension reversion for corporate purposes, that is, in a stock redemption program to reduce the number of outstanding shares, the corporation did not own the asset that generated the gain. We conclude indicia of corporate ownership are simply not present in this record.
There is also no evidence the Plan and Trust were integral to Celanese's business of manufacturing and selling chemicals. The parties acknowledge that Celanese maintained the Plan as an inducement to retain its current employees and to attract other qualified employees. However, the acquisition, management, and disposition of the trust assets were not part of Celanese's regular trade or business operations of manufacturing and selling chemicals: Celanese did not hold title to the assets, and in the regular course of its business, the acquisition, management, and disposition of the trust assets did not generate income for Celanese's business. Thus, they were not part of its business operations. The fact that the termination of the CRSP and the CRSP Trust resulted in a pension reversion to Celanese did not transform the trust assets into an integral part of its business operations.
Accordingly, we conclude as a matter of law that the $388.8 million pension reversion was not business income for purposes of section 25120, subdivision (a).

DISPOSITION
The judgment is reversed. Celanese shall recover costs on appeal.
SIMS, Acting P.J., and KOLKEY, J., concur.
NOTES
[1] Undesignated statutory references are to the Revenue and Taxation Code.
[2] The Attorney General filed two requests for judicial notice which are unopposed. The March 19, 1999, request, which consists of legislative materials from Internet "home pages" for the Legislature and Governor of New Mexico, is granted. (Evid.Code, § 452, subd. (c).) The August 24, 1999, request, which includes a copy of the slip opinion in Union Carbide Corporation v. Offerman (N.C.App.1999) 513 S.E.2d 341 (hereafter Union Carbide), copies of North Carolina procedural statutes and rules regarding the timing of appellate decisions and rights of appeal, and a certified copy of Offerman's notice of appeal in Union Carbide, is also granted. (Evid.Code, §§ 451, subd. (f), 452, subds. (a), (c), (d)(2), & (e)(2).)
[3] Twenty-two other states join California as full members of the Multistate Tax Commission. These states have incorporated the UDITPA into their statutory law. (Robert Half Internal., Inc. v. Franchise Tax Bd.) (1998) 66 Cal.App.4th 1020, 1023, 78 Cal.Rptr.2d 453; 62 West's Ann. Rev. & Tax Code (1999 pocket pt.) preceding § 25120, pp. 326-327.) Seventeen additional states are associate members of the Multistate Tax Commission, expressing a commitment to its goals. However, associate members have not adopted the Multistate Tax Compact, which includes the UDITPA. (Polaroid Corporation v. Offerman (1998) 349 N.C. 290, 293, fn. 2, 507 S.E.2d 284, 288, fn. 2, cert. den. May 3, 1999,  U.S., 119 S.Ct. 1576, 143 L.Ed.2d 671 (hereafter Polaroid); §§ 38001, 38006, art. IV.) California adopted the Multistate Tax Compact in 1974. (Stats.1974, ch. 93, § 3, p. 193.)
[4] In Robert Half Internat., Inc. v. Franchise Tax Bd., supra, 66 Cal.App.4th at page 1024, 78 Cal.Rptr.2d 453, the parties agreed the definition of business income set forth in section 25120, subdivision (a) contained both a transactional test and a functional test. Thus, the issue was not, in fact, litigated in that case.
[5] Five jurisdictions' judicial decisions hold that the definition of business income includes both a transactional and functional test. (See Polaroid, supra, 349 N.C. 290, 507 S.E.2d 284; Texaco-Cities Service Pipeline Company v. McGaw, supra, 182 Ill.2d 262, 230 Ill.Dec. 991, 695 N.E.2d 481; Ross-Araco Corp. v. Bd. of Fin. & Revenue (1996) 544 Pa. 74, 674 A.2d 691; Pledger v. Getty Oil Exploration Co. (1992) 309 Ark. 257 [831 S.W.2d 121]; District of Columbia v. Pierce Associates, Inc. (D.C.App.1983) 462 A.2d 1129.) In response to court decisions to the contrary, four jurisdictions have amended their statutes to clarify that the functional test exists. (See Iowa: Iowa Code, § 422.32 and Phillips Petroleum Co. v. Iowa Dept. of Revenue and Finance (1993) 511 N.W.2d 608; Kansas: K.S.A. § 79-3271, and In re Chief Industries (1994) 255 Kan. 640, 875 P.2d 278; New Mexico: N.M. House Bill No. 349 (amending N.M.S.A. § 7-4-2) approved by Governor, Mar. 18, 1999, http://www.governor.state.nm.us/ (New Mexico) and McVean & Barlow v. New Mexico Bureau of Revenue (1975) 88 N.M. 521 [543 P.2d 489]; Tennessee: Tenn.Code, § 67-4-804, and Federated Stores Realty v. Huddleston (Tenn.1992) 852 S.W.2d 206, relying on General Care Corp. v. Olsen (Tenn.1986) 705 S.W.2d 642.)