No. 83,927

In the Matter of the Appeal of The Kroger Co., from an Order of the Division of Taxation on Assessment of Corporate Income Tax.

(12 P.3d 889)

Opinion filed November 3, 2000.

*John H. Wachter*, of Wright, Henson, Somers, Sebelius, Clark & Baker, L.L.P., of Topeka, argued the cause and *Charles N. Henson*, of the same firm, was with him on the brief for appellant The Kroger Co.

*James Bartle*, of Kansas Department of Revenue, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J: Multistate taxpayer appeals the Board of Tax Appeals' (BOTA) order disallowing as an apportionable business expense an interest expense incurred to fight a hostile takeover.

BOTA classified the expense as a nonbusiness expense, which was allocated to the taxpayer's state of commercial domicile. Taxpayer appealed, claiming its interest expense was a business expense, apportionable to Kansas.

The taxpayer, The Kroger Co. (Kroger), and the Department of Revenue (KDR) stipulated that late in 1988, Kroger, an Ohio corporation operating retail food and grocery stores in Kansas and numerous other states, was the target of hostile takeover attempts by two separate groups. In response to these threats, Kroger's board of directors determined it was in the best interest of the company and its shareholders to defend against the hostile takeover. To avoid the takeover, Kroger declared a special dividend to its shareholders. To finance the special dividend, Kroger borrowed $4.1 billion. The borrowing of $4.1 billion required Kroger to pay large amounts of interest for the tax years ending December 30, 1989, through January 2, 1993 (the audit period). The interest expenses were declared by Kroger pursuant to the Internal Revenue Code, 26 U.S.C. §162 (1994), as ordinary and necessary business expenses and deducted by Kroger on its federal income tax return.

KDR determined that Kroger's interest cost associated with the 1988 restructuring was a nonbusiness expense and not apportionable to Kansas. As a result, KDR assessed Kroger additional Kansas income tax of $5,145,161, with interest of $4,095,734 and a penalty of $1,286,294, for a total assessment of $10,527,189. KDR's assessment was based on its determination that Kroger's claimed interest expense resulting from borrowing to deter a hostile takeover was not an apportionable business expense arising from an activity in the regular course of Kroger's business.

The Kansas Income Tax Act, K.S.A. 79-3201 *et seq.*, provides that the Act shall be administered by the Secretary of Revenue or the Secretary's designee for the purpose of ascertaining the correctness of any return. See K.S.A. 79-3233. Kroger protested KDR's assessment by filing a request for hearing with the Secretary of KDR. The Secretary issued a written determination, finding that Kroger's interest expense associated with defending against the hostile takeover bid was not a business expense incurred in the

regular course of Kroger's operations; therefore, the interest expense of Kroger's $4.1 billion debt was a nonbusiness expense.

Kroger appealed the Secretary's determination to BOTA. BOTA found that the regular course of Kroger's business is the retail sale of groceries and that fending off a hostile takeover was not an activity associated with the selling of groceries. By a 4 to 1 majority, BOTA concluded that the interest expense was nonbusiness in nature and should be allocated to Kroger's state of domicile. BOTA later denied Kroger's request for reconsideration. Kroger appealed to the Court of Appeals, and its motion for transfer to the Supreme Court was subsequently granted. Our jurisdiction is pursuant to K.S.A. 20-3017.

Kroger seeks review under the Kansas Act for Judicial Review and Civil Enforcement of Agency Actions (KJRA), K.S.A. 77-601 *et seq.*, claiming BOTA erroneously interpreted the Kansas Income Tax Act or misapplied the law. See K.S.A. 77-621(c)(4). The KJRA provides that the party challenging BOTA's action has the burden to prove that the action by BOTA was erroneous. K.S.A. 77-621(a). See *In re Tax Appeal of Scholastic Book Clubs, Inc.*, 260 Kan. 528, 536, 920 P.2d 947 (1996).

Under the doctrine of operative construction, the interpretation of a statute by an agency charged with its enforcement is entitled to judicial deference. *Blue v. McBride*, 252 Kan. 894, Syl. ¶ 7, 850 P.2d 852 (1993). Despite the deference given to an agency's interpretation of the law it administers, if the court finds that the administrative body's interpretation is erroneous as a matter of law, the court will take corrective steps. *In re Tax Appeal of Univ. of Kan. School of Medicine*, 266 Kan. 737, 749, 973 P.2d 176 (1999). Whether an agency has erroneously interpreted a statute is a question over which an appellate court has unlimited review. *Wasson v. United Dominion Industries*, 266 Kan. 1012, 1018, 974 P.2d 578 (1999).

## Statutory Construction of Tax Laws

First, Kroger contends that KDR does not have the statutory authority to disallow the interest expense as a business expense. Kroger notes that the principles and rules of statutory construction

of tax laws place the burden on KDR to cite to clear and unequivocal terms within the tax statutes. The principles have been established by the court because of the general nature of the imposition and collection of taxes. Although courts have uniformly recognized that the power to levy taxes is inherent in the power to govern, the exercise of that power is dependent on the existence of legislation creating the tax. Nothing is taxable unless clearly within a taxing statute. *Robbins-Leavenworth Floor Covering, Inc. v. Leavenworth Nat'l Bank & Trust Co.*, 229 Kan. 511, 512, 625 P.2d 494 (1981). Tax laws are statutory and do not exist apart from the statute and, as such, they must be strictly construed. *American Home Life Ins. Co. v. Board of Shawnee County Comm'rs.*, 22 Kan. App. 2d 18, 23, 913 P.2d 1211, *rev. denied* 258 Kan. 857 (1995). Where there is a reasonable doubt as to the meaning of a taxing statute, the statute will be construed most favorably to the taxpayer. *Fleming Co. v. McDonald*, 212 Kan. 11, Syl. ¶ 1, 509 P.2d 1162 (1973). KDR argues that K.S.A. 79-3272 and K.S.A. 79-3274 encompass expenses as a component of net income.

Because corporations may earn income in their state of domicile as well as other states, many states, including Kansas, adopted the Uniform Division of Income for Tax Purposes Act (UDITPA), K.S.A. 79-3271 *et seq.* Neither the Kansas statutes nor the regulations of the KDR define a "nonbusiness expense." However, K.S.A. 79-3272 provides that "net" business and nonbusiness income shall be allocated and apportioned according to UDITPA. The Multistate Tax Compact, K.S.A. 79-4301 *et seq.*, adopted in Kansas in 1967, defines "income tax" as a tax imposed on or measured by an amount arrived at by deducting expenses from gross income. K.S.A. 79-4301, Art. II (4). Furthermore, K.S.A. 79-3274 provides that allocable nonbusiness income shall be limited to the total nonbusiness income received which is in excess of any related expenses which have been allowed as a deduction during the income year. Expenses, therefore, are a factor in the derivation of net income, and a statutory basis, implicit in the determination of "net" income, exists for making a determination regarding whether a multistate corporation may apportion certain expenses to the various states where it does business. Kroger apportioned part of its

interest cost to its Kansas income based upon the UDITPA, the Internal Revenue Code, and its interpretation of the relevant Kansas tax statutes.

## Classification of Interest Expense

The borrowing of $4.1 billion to defeat the hostile takeover required Kroger to pay large amounts of interest during the audit period. The calculation of the taxes owed to Kansas by a corporation begins with the corporation's federal taxable income; that income is then subject to modification as specified in K.S.A. 79-32,138. UDITPA provides that a corporation's business income is apportioned between the states in which it does business and its nonbusiness income is allocated to its state of domicile. K.S.A. 79-3272. "Business income" is defined in K.S.A. 79-3271(a) as "income arising from transactions and activity in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations." "Nonbusiness income" is "all income other than business income." K.S.A. 79-3271(e). The question we must answer is whether Kroger's interest expenses on the loans used to finance its defense of a hostile takeover are an apportionable business expense or allocable nonbusiness expense.

Both parties agree that only the transactional test applies to determine whether Kroger's expense during the audit period is a business or nonbusiness expense. BOTA found the interest expenses to be nonbusiness expenses by applying the transactional test adopted in *Western Natural Gas Co. v. McDonald*, 202 Kan. 98, 446 P.2d 781 (1968). The controlling factor in the transactional test for the determination of business income is the nature of the particular transaction giving rise to the income. To be business income, the transaction and activity must have been in the regular course of the taxpayer's business operations. 202 Kan. at 100.

Kroger argues that the restructuring expense was an operational business expense to retain financial management of the corporation's assets, rather than an investment. For support, Kroger points out that the interest was deducted on its federal income tax return

as a business expense and that the expense was also within the general rules for deductible business expenses set out in *Commissioner v. Lincoln Savings & Loan Ass'n*, 403 U.S. 345, 352, 29 L. Ed. 2d 519, 91. S. Ct. 1893 (1971).

Kroger points out that it files income tax returns in 31 states, and none of those jurisdictions treat the expenses apportioned by Kroger as nonbusiness expenses. Kroger contends that classifying the interest expense as a nonbusiness expense violates the principles of the Multistate Tax Compact, including the promotion of uniformity and compatibility across jurisdictions and the avoidance of duplicative taxation. Kroger asserts that treating the interest expenses as nonbusiness expenses will cause it to suffer duplicative taxation.

KDR argues that Kansas does not conform to other jurisdictions in treating Kroger's interest expenses as a nonbusiness expense because at the time of the assessment Kansas was one of a few states that had rejected the functional test for defining business income. The functional test, rather than focusing on the particular transaction giving rise to the income as required by the transactional test, focuses on the utilization of the property in the business. *In re Tax Appeal of Chief Industries, Inc.*, 255 Kan. 640, 647, 875 P.2d 278 (1994). Under the functional test, gain from the sale of property is business income if the property was used in the taxpayer's business operations. 255 Kan. at 654.

We note that the 1996 Kansas Legislature amended the tax statutes to include the functional test. L. 1996, ch.264, §1. In amending the statute, the Kansas Legislature recognized the non-uniformity resulting from excluding the functional test, amended the tax law to deal with the problem, and chose to limit the application of the functional test to tax years after December 31, 1995. K.S.A. 79-3271(a).

To qualify as an allowable deduction under 26 U.S.C. §162(a) of the Internal Revenue Code, an item must (1) be paid or incurred during the taxable year, (2) be for carrying on any trade or business, (3) be an expense, (4) be a necessary expense, and (5) be an ordinary expense. The requisite showing that an expense is "necessary" is a minimally burdensome one. *PNC Bancorp, Inc. v. C.I.R.*,

212 F.3d 822, 828 (3d Cir. 2000) (citing *Lincoln Savings & Loan*, 403 U.S. at 352). Clearly, the test for allowable deductions under the Internal Revenue Code is broader than the transactional test for business income. To meet it, a taxpayer need show only that the expenditures were "appropriate and helpful." *Bancorp*, 212 F.3d at 828 n.11.

KDR argues that the Internal Revenue Code does not apply. For support of its argument that expenses associated with transactions undertaken to defeat a hostile takeover attempt do not qualify as business transactions under the transactional test, KDR relies on *Robert Half Internat., Inc. v. Franchise Tax Bd.*, 66 Cal. App. 4th 1020, 78 Cal.Rptr.2d 453 (as modified on denial of rehearing [1998]); *Phillips Petroleum v. Dept. of Revenue*, 511 N.W.2d 608 (Iowa 1993) (as amended on denial of rehearing [1994]); *Hercules, Inc. v. Commissioner of Revenue*, 575 N.W.2d 111 (Minn. 1998); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87 (Tenn. 1993). We note that California and Minnesota are members of the Multistate Tax Commission. Tennessee is an associate member and Iowa is a project member (Multistate Tax Commission, April 10, 2000).

In *Phillips*, the management of a petroleum corporation responded to a threatened hostile takeover by purchasing a substantial amount of its outstanding common stock. To retire the debt incurred for the purchase, the corporation sold gas and oil producing assets. The question was whether the income from the sale of those assets was apportionable. Applying the transactional test for business income, the *Phillips* court found that the income was nonbusiness income. The court based its holding on the unprecedented nature and enormity of the transaction that was "clearly a once-in-a-corporate-lifetime occurrence." *Phillips*, 511 N.W.2d at 611. The Iowa legislature promptly amended the Iowa tax statute to include the functional test. Iowa Code §422.32(2) (1995). See *Polaroid Corp. v. Offerman*, 349 N.C. 290, 295, 507 S.E.2d 284 (1998), *cert denied* 526 U.S. 1098 (1999).

In *Hercules*, a corporation domiciled in Delaware and conducting business in Minnesota, sold its stock in a corporation it helped create 4 years earlier, Himont, Inc. The sale resulted in net capital

gain. Hercules reported the gain as nonapportionable income on its Minnesota corporate tax return. The Minnesota Commissioner of Revenue issued a notice of assessment, seeking payment of additional taxes based on the income from the sale. Hercules appealed. The Minnesota tax court concluded that the income was business income apportionable to Minnesota because Hercules held the stock as a means of furthering its trade or business. The Minnesota Supreme Court reversed the tax court, concluding that the income was nonbusiness income and, therefore, not apportionable. *Hercules*, 575 N.W.2d at 113.

In reaching its conclusion, the Minnesota court framed the issue as whether the income was derived from the trade or business of Hercules. The court noted that Minnesota tax law provides that "intangible property is employed in a trade or business if the owner of the property holds it as a means of furthering the trade or business." 575 N.W.2d at 114-15. Applying the Minnesota statutory definition and prior related case law, the *Hercules* court discerned the boundary between business and nonbusiness income, noting:

> "Hercules' ownership and sale of Himont stock was not sufficiently linked to its day-to-day operations to make the Himont gain business income. Hercules carried the Himont stock on its books for more than four years as an investment, not as an asset. Moreover, it sold its Himont holdings only in direct response to Montedison's hostile takeover threat. We see no indication that Hercules wanted or needed the proceeds from the Himont gain to provide operating funds. . . . The record leads us to conclude that neither Hercules' holding of the Himont stock nor the gain realized from its sale was used in Hercules' day-to-day business operations. Therefore, we hold that the Himont gain is nonbusiness income and thus not apportionable to Minnesota." 575 N.W.2d at 115-16.

In *Union Carbide Corp.*, 854 S.W.2d 87, the taxpayer, Union Carbide, was a multistate, multinational corporation organized and incorporated under the laws of New York, with its principle place of business and commercial domicile in Connecticut. Necessitated by financial difficulties stemming from the Bhopal, India, industrial accident, Union Carbide announced a restructuring program under which it planned to repurchase some of the outstanding shares of its common stock and divest itself of certain nonstrategic assets and businesses. Before the restructuring program was completed,

Union Carbide became a target of a hostile tender offer by a competing chemical company. In response to the threatened hostile takeover, Union Carbide commenced an exchange offer of approximately $4.347 billion to its shareholders.

To raise the $4.347 billion, Union Carbide sold and liquidated seven distinct lines of business and borrowed $.71 billion. On its Tennessee tax return, Union Carbide reported the capital gains realized on the sale of the lines of business as nonbusiness earnings. The Tennessee Department of Revenue characterized the income as business earnings. The case was appealed to the Supreme Court of Tennessee.

The Tennessee court applied the transactional test for business income. In analyzing whether the gains from the disposition of assets were earnings arising from transactions and activity in the regular course of Union Carbide's business, the court inquired into the frequency and regularity of similar transactions, the former practices of the business, and Union Carbide's subsequent use of the income. 854 S.W.2d at 92. The Tennessee court concluded that although Union Carbide regularly acquired and disposed of assets, the capital gains from the 1986 divesture were not "business earnings" arising out of the regular course of Union Carbide's business because it had never before engaged in similar transactions of that magnitude. The court concluded the sale was nonbusiness income because the gains from the sales were not reinvested in Union Carbide's ongoing business operations. 854 S.W. 2d at 93-94.

In *Robert Half,* 66 Cal. App. 4th 1020, the corporation's principal business was the development of real estate. The corporation spent $7.5 million to repurchase and cancel a warrant held by a third party. On its corporate franchise tax return, the corporation deducted the entire payment as a nonbusiness loss allocated to its state of domicile. The California trial court ruled that the corporation was not entitled to deduct the loss as a nonbusiness loss. On appeal, the parties agreed that the transaction did not qualify as a business loss under the transactional test.

After noting that the California statute defining business income includes both the transactional and functional tests, the California

appellate court applied the functional test to determine whether the corporation's payment of $7.5 million to cancel the warrant was a business loss. The court found that the warrant which entitled the holder to purchase a substantial and perhaps controlling block of stock at a below-market price had an unsettling effect on the market for the corporation's shares. Since the existence of that possibility was an extraordinary event, the loss the corporation incurred to negate that possibility was an extraordinary event that fell outside its regular trade or business operations. The court held that under the circumstances the corporation's payment resulted in a nonbusiness loss. 66 Cal. App. 4th at 1028.

KDR urges this court to apply *Phillips*, *Hercules*, *Union Carbide*, and *Robert Half* and find that Kroger's borrowing to defend against a hostile takeover was an extraordinary event that occurred in response to unusual circumstances and, therefore, expenses associated with the borrowing are nonbusiness expenses allocable to Kroger's state of domicile and not apportionable to Kansas.

Kroger attempts to distinguish those cases by pointing out that the cases cited concerned income or losses resulting from taxable events, such as the acquisition or sale of property. Kroger asserts that its borrowing resulted in an interest expense, not a taxable transaction. Kroger characterizes the payment of interest expense as an operational expense—a function of its ongoing business operations, not extraordinary in nature. Furthermore, Kroger argues that KDR has unilaterally disallowed all Kroger's interest expenses, without regard to whether the expenses were incurred as part of the 1988 restructuring.

To support its argument, Kroger characterizes the payment of interest as an ongoing series of transactions, not an isolated event such as the sale of assets, *i.e.*, its borrowing and the interest expense constituted financial management and ordinary and necessary business expenses. KDR, on the other hand, states that we must consider the underlying transaction which resulted in the interest expense—the borrowing undertaken to defend against a hostile takeover—and that, based on our statutes and the case law it cited, such transactions are extraordinary and outside the ordinary course of business.

At the time of the assessment, the transactional test applied to determine whether an expense during the audit period was a business or nonbusiness expense. Resolution of the question can best be had by the definition of business income. As noted previously, business income is defined in K.S.A. 79-3271(a) as "income *arising from* transactions and activity in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations." (Emphasis added.)

The inquiry is, did the transaction give rise to business income? Analyzing expenses similarly to income, to be a business expense, the transaction must be in the regular and ordinary course of business. The controlling factor in the transactional test for the determination of business income is the nature of the particular transaction giving rise to the income. BOTA is correct that under the transactional test, the borrowing of money to defend against a hostile takeover is not an expense in the regular course of business, and the resulting interest expense is a nonbusiness expense.

Affirmed.