[No. A086925. First Dist., Div. One. Oct. 2, 2000.]

CITICORP NORTH AMERICA, INC., et al., Plaintiffs and Appellants, v. FRANCHISE TAX BOARD, Defendant and Respondent.

COUNSEL

Morrison & Foerster, Eric J. Coffill, Lisa R. Brenner and Carley A. Roberts for Plaintiffs and Appellants.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, and David Lew, Deputy Attorney General, for Defendant and Respondent.

OPINION

**MARCHIANO, J.**—Citicorp North America, Inc. (Citicorp) and its affiliates appeal from a decision of the superior court in favor of the Franchise

Tax Board (FTB) in this action for refund of corporate franchise taxes.[1] We affirm the trial court's judgment. The FTB properly included the California sales of Citicorp's Citibank (South Dakota), a member of the unitary corporate group, in calculating the amount of income apportionable to California operations under the rule in effect at the time Citicorp filed its amended returns. We also reject Citicorp's contention that the gain on sales of real property, including its corporate headquarters, was not business income.

## BACKGROUND

The facts of this case are not in dispute. The parties submitted a joint stipulation and exhibits to the trial court regarding the relevant facts, which are summarized as follows. Citicorp is a Delaware corporation, with its principal place of business in New York. Citicorp and its affiliate corporations are part of a worldwide financial services organization. Citicorp directly and indirectly owns several hundred foreign and domestic corporations that offer lending, deposit taking, investment management and other traditional financial and banking services. At the relevant time Citicorp owned over 550 domestic corporations, 88 of which are California taxpayers. The two disputed issues in this appeal are the FTB's allocation of California destination sales by Citicorp's Citibank (South Dakota) affiliate, and characterization of the gain on sales of four properties as business income.

*Taxes Attributable to Sales by Citibank (South Dakota)*

For the tax years ending December 31, 1985, through December 31, 1988, Citicorp and its affiliates filed separate company franchise tax returns in California. In 1992 and 1993, the Citicorp group filed amended returns requesting refunds for the challenged years, taking the position that Citicorp was conducting a worldwide unitary business, and that the combined franchise tax must be computed on a unitary basis. FTB has not challenged Citicorp's position regarding its unitary business.

Prior to Citicorp's filing of the amended returns, the State Board of Equalization (SBE) issued its two decisions in *Appeal of Finnigan Corporation.* (*Appeal of Finnigan Corporation* (Aug. 25, 1988) [1986-1990 Transfer Binder] Cal. Tax Rptr. (CCH) ¶ 401-653, p. 25,242 (*Finnigan I*), opn. on denial of rehg. (Jan. 24, 1990) [1986-1990 Transfer Binder] Cal. Tax Rptr. (CCH) ¶ 401-797, p. 25,755 (*Finnigan II*) (reference to both opinions collectively is to *Finnigan*).) Changing the way in which an out-of-state affiliate's sales are apportioned to determine the income of the unitary

---

[1] References to "Citicorp" include the members of the unitary group.

business, *Finnigan* overruled the precedential decision of *Appeal of Joyce, Inc.*, which had guided allocation of corporate franchise taxes in California for 22 years. *Finnigan* was applied retroactively in the subsequent case of *Appeal of The NutraSweet Company* (Oct. 29, 1992) [1992-1993 Transfer Binder] paragraph 402-524, p. 27,351. (*Appeal of Joyce, Inc.* (Nov. 23, 1966) [1966-1971 Transfer Binder] ¶ 203-523, p. 13,115; Cal. Franchise Tax Bd., Notice No. 90-3 (June 8, 1990) [1991-1992 Transfer Binder] Cal. Tax Rptr. (CCH) ¶ 401-820, p. 25,856 (Notice No. 90-3).)

Citicorp's amended returns constituted timely claims for refund. It is undisputed that Citibank (South Dakota), a South Dakota affiliate that handles VISA and MasterCard credit card business, was a member of the unitary group for the years in question. It is also undisputed that Citibank (South Dakota) had no physical presence in California, its only office was located in South Dakota, and it was not subject to California's corporate franchise or income tax during the years in question. Citibank (South Dakota) had numerous credit card customers in California. In calculating its California sales, Citicorp excluded California sales by Citibank (South Dakota) in accordance with the holding in the overruled *Appeal of Joyce, Inc.*, decision.

FTB audited the amended returns and recalculated the California sales to include the California sales by Citibank (South Dakota) pursuant to the rule of *Finnigan*. The FTB's calculation reduced the amount of the refund due to Citicorp. The question presented to the trial court was whether application of the *Finnigan* rule was appropriate and constitutional.

*Taxes Attributable to Sales Characterized as Business Income*

The second issue involves characterization of the income from the sale of corporate properties. With respect to the year ended December 31, 1987, the FTB concluded that gains from the sale of four parcels of real property constituted business income and should be included in Citicorp's business income subject to apportionment in California. The four properties included the corporate headquarters of a wholly owned subsidiary, a nine-story office building partially occupied by corporate personnel, a 59-story building known as Citicorp Center, and a residence and land in Osaka, Japan.

During the income years at issue and prior to the sale of the properties, Citicorp included the original cost of the four properties in the denominator

of the property factors used to determine business income in an apportionment formula.[2] Citicorp also included any rental income and expenses associated with the management of the buildings in determining its business income attributable to California sources. However, when it filed its amended return, Citicorp characterized the gain on the sale of these properties as nonbusiness income. In its audit of Citicorp's amended return and request for refund, the FTB recharacterized the gain on sale of these properties as business income.

On October 22, 1997, Citicorp filed a suit for refund in the superior court. The complaint contained six causes of action. The first through fourth causes of action alleged that inclusion of the sales of Citibank (South Dakota) violated the Uniform Division of Income for Tax Purposes Act (UDITPA, adopted in California as Rev. & Tax. Code, § 25120 et seq.) and the due process and equal protection clauses of the United States and California Constitutions, and the commerce clause of the United States Constitution.[3] The fifth cause of action alleged that the gains from sales of the buildings were nonbusiness income under the applicable statutes and regulations. The sixth cause of action was resolved between the parties and no issue regarding it is raised in this appeal.

On March 3, 1999, the court issued its amended statement of decision, deciding the matter in favor of the FTB. Citicorp and its affiliates appealed.

## DISCUSSION

Citicorp challenges the FTB's inclusion of the property and sales of the South Dakota affiliate in the numerator of the formula used to apportion the group's California income. Citicorp argues that including property and sales of the South Dakota affiliate is inconsistent with the Revenue and Taxation Code and the unitary method of taxation in that it ignores separate business identities. Citicorp also contends that the FTB's position violates the holding

[2]The apportionment formula divides business income using three fractions, called factors, that are a representative source of the taxpayer's income from property, including certain sales of property, payroll and sales. The formula can be described as follows. "The numerator of each factor is the dollar amount of the particular category that is attributed to the taxing jurisdiction, and the denominator of each factor is the total dollar amount of the same category for all jurisdictions. The three fractions are added together and the sum divided by three. The resulting fraction, often expressed as a percentage, is then multiplied by that amount of the tax base that has not been specifically allocated. The product so determined is the amount of income attributed to the state by the taxing formula." (Boren, *Equitable Apportionment: Administrative Discretion and Uniformity in the Division of Corporate Income for State Tax Purposes* (1976) 49 So.Cal. L.Rev. 991, 996, fns. omitted; see *id.,* p. 996, fn. 22.) After the tax years at issue in this case, the statutory formula was changed in ways that do not impact this appeal. (Rev. & Tax. Code, § 25128.)

[3]Unless otherwise indicated, all statutory references are to the Revenue and Taxation Code.

of *Current, Inc. v. State Bd. of Equalization* (1994) 24 Cal.App.4th 382 [29 Cal.Rptr.2d 407] by taxing nontaxable property of the out-of-state affiliate.[4] Citicorp argues that application of the rule of *Finnigan* violates the UDITPA principle of uniformity because other states did not adopt it. Citicorp urges this court to ignore *Finnigan* in light of the FTB's initial opposition to that rule and the SBE's overruling of *Finnigan* and the prospective return to the old rule of *Joyce* after the judgment in this case.

Citicorp's second challenge is to the characterization of the four sales of real property as business income. Citicorp argues that the resulting gains are not business income under a transactional test and that the trial court erred in applying a separate functional test of business income. Citing the FTB's own regulations, Citicorp argues that the challenged gains are not business income under any test. Finally, Citicorp contends that it is unconstitutional to tax the gain on these sales. We review Citicorp's arguments in the order presented and affirm the judgment of the trial court.

*Background of Franchise Taxation of Unitary Businesses*

This case involves apportionment of the income of a unitary business. A unitary business is one that receives income "from or attributable to sources both within and without the state . . . ."[5] (§ 25101.) If a unitary business exists, taxes are apportioned by formula to allocate to California for taxation, "its fair share of the taxable values of the taxpayer . . . ." (*Butler Brothers v. McColgan, supra*, 17 Cal.2d 664, 667-668.) In calculating corporate franchise taxes of a unitary business, the FTB apportions income generated by the unitary business based on the relationship of the combined income to the income derived from California sources.

---

[4]Corporations Code section 150 defines "affiliate" as follows. "A corporation is an 'affiliate' of, or a corporation is 'affiliated' with, another specified corporation if it directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the other specified corporation." According to exhibits submitted in this matter, the affiliates in this action are owned directly or indirectly more than 50 percent by Citicorp.

[5]A unitary business is generally defined as two or more business entities that are commonly owned and integrated in a way that transfers value among the affiliated entities. In *Butler Brothers v. McColgan* (1941) 17 Cal.2d 664, 668 [111 P.2d 334], our Supreme Court stated that the presence of the following three factors is sufficient to establish the existence of a unitary business: (1) unity of ownership; (2) unity of operation as evidenced by central purchasing, advertising, accounting and management divisions; and 3) unity of use in its centralized executive force and general system of operation. In *Edison California Stores v. McColgan* (1947) 30 Cal.2d 472 [183 P.2d 16], the court proposed an alternative standard that stated if the operation of the portion of the business within the state is dependent upon or contributes to the operation of the business outside the state, its operations are unitary. (See also *Container Corp. v. Franchise Tax Bd.* (1983) 463 U.S. 159, 179 [103 S.Ct. 2933, 2947-2948, 77 L.Ed.2d 545] [noting three elements of a unitary business: (1) functional integration; (2) centralized management; and (3) economies of scale].)

The California statutory apportionment formula takes into account three fractions. The first fraction, known as the "property factor," has a numerator of the average value of California real and tangible personal property and a denominator of all real and tangible personal property. (§ 25129.) The second fraction is the "payroll factor," which is the total amount of compensation paid by the taxpayer in California divided by the total compensation paid everywhere. (§ 25132.) The third fraction is the "sales factor," which is the total sales in California divided by the "total sales of the taxpayer everywhere during the income year." (§ 25134.) Each fraction has a numerator representing the amount attributable to California and a denominator representing the worldwide amount.[6] The statutory scheme of apportionment is derived from UDITPA, which has been adopted by over 20 states and was enacted in California in 1966. Revenue and Taxation Code sections 25134 and 25135 are substantially identical to UDITPA sections 15 and 16 (7A West's U. Laws Ann. (1999) U. Division of Income for Tax Purposes Act, §§ 15, 16, pp. 392-393.). The expressed general purpose of UDITPA is to standardize state corporate income tax laws and "to make uniform the law of those states which enact it." (Rev. & Tax. Code, § 25138.) If each state applied the apportionment formula in the same way, the sum of the amounts of income attributed to each taxing state would equal the tax base of the corporation and provide uniform fairness.

The issue in apportionment of sales is how to properly attribute income among all of the states in which a business operates. Sales of tangible personal property are generally attributed to the state of destination if the taxpayer is subject to taxation in that state. If the taxpayer's only presence in that state is its customers, sales are generally "thrown back," or considered for apportionment in its state of origin.[7] Shortly after California's adoption of UDITPA, the SBE issued its opinion in *Appeal of Joyce, Inc., supra,* [1966-1971 Transfer Binder] Cal. Tax Rptr. (CCH) paragraph 203-523, p. 13,115. (FTB, Notice No. 90-3, *supra,* [1991-1992 Transfer Binder] Cal. Tax Rptr. (CCH) ¶ 401-802, p. 25,856.) In *Joyce,* the SBE determined that Public Law No. 86-272 (Sept. 14, 1959) 73 Statutes at Large 555 (15 U.S.C. § 381 et seq.) prevented the state from considering income from a member of a unitary group where the individual member's sole contact in California was

---

[6]See footnote 2, *ante.*

[7]The version of.section 25135 in effect prior to December 1, 2000 (the "throwback rule") provides for inbound and outbound sales: "(a) Sales of tangible personal property are in this state if any of the following apply: [¶] (1) The property (including unprocessed timber) is delivered or shipped to a purchaser, other than the United States government, within this state regardless of the f.o.b. point or other conditions of the sale. [¶] (2) The property (including unprocessed timber) is shipped from an office, store, warehouse, factory, or other place of storage in this state and (A) the purchaser is the United States government or (B) the taxpayer is not taxable in the state of the purchaser." Application of the rule is limited by the requirements of federal law regarding tax on activities in interstate commerce. (See 15 U.S.C. § 381(a).)

sales representatives who solicited, but could not accept, orders in the state.[8] *Joyce* involved an Ohio corporation and its California subsidiary, both of which sold shoes in California. Only the subsidiary was subject to taxation in California. The SBE concluded that inbound sales by the parent company, which was not subject to tax in California, could not be included in the allocation formula for purposes of calculating the sales factor, even though another member of the group was taxable in California. *Joyce* was the rule in California from 1966 until 1988.

In 1988 the SBE adopted a new method of attributing income for members of unitary groups. *Finnigan I, supra,* [1986-1990 Transfer Binder] Cal. Tax Rptr. (CCH) paragraph 401-653, page 25,241, a case that was the factual mirror image of *Joyce,* involved two California corporations with outbound sales to other states. Only one of the corporations had a nexus with the foreign state and the FTB threw back the sales of the second corporation to California. The SBE, however, agreed with the taxpayer that outbound sales to non-California destinations made by a California member of a unitary group should not be thrown back to California for inclusion in the sales factor formula where another member of the group had a nexus in the foreign state.[9] This change from *Joyce* was based on the fact that one member of the unitary group was taxable in the destination state, even though the individual seller was not. Under *Joyce,* if the individual seller had not been subject to tax in the foreign state, its foreign sales would have been thrown back to the state of origin. The SBE reached its new result by interpreting the word "taxpayer" in this portion of the Revenue and Taxation Code to mean all members of a unitary group. In addition, in *Joyce* the SBE had been concerned that the federal statute (15 U.S.C. § 381(a)) would be interpreted in an expansive manner to restrict taxation of unitary groups. However, such legitimate fears were subsequently proved unfounded. (*Finnigan II, supra,* [1986-1990 Transfer Binder] Cal. Tax Rptr. (CCH) ¶ 401-797, p. 25,755; see, e.g., *Brown Group Retail, Inc. v. Franchise Tax Bd.* (1996) 44 Cal.App.4th 823 [52 Cal.Rptr.2d 202].)

---

[8]Public Law No. 86-272 protects an out-of-state corporation from state income taxes if its only activity in the state is: "the solicitation of orders . . . for sales of tangible personal property, which orders are sent outside the [s]tate for approval or rejection, and, if approved, are filled by shipment or delivery from a point outside the [s]tate . . . ." (15 U.S.C. § 381(a)(1).)

[9]The actual issue in *Finnigan I* was application of the throw back rule, which is not at issue in this case. As explained in *Finnigan I,* the general rule is that sales of tangible personal property are assigned to the state of destination of the goods for purposes of the sales factor of the apportionment formula. "However, such sales are assigned, or 'thrown back,' to California if the property is shipped from this state and the 'taxpayer is not taxable in the state of the purchaser' (the 'throw back' rule)." (*Finnigan I, supra,* [1986-1990 Transfer Binder] Cal. Tax Rptr. (CCH) ¶ 401-653, p. 25,242.) The result in *Finnigan I* was that the affiliate's sales to foreign states were not thrown back to California because a member of the group was taxable in the foreign state.

On January 24, 1990, the SBE issued its opinion denying rehearing in *Finnigan II.* (*Finnigan II, supra,* [1986-1990 Transfer Binder] Cal. Tax Rptr. (CCH) ¶ 401-797, p. 25,755.) The SBE noted that it had not expressly overruled *Joyce* in *Finnigan I* because the factual context was different. However, the SBE noted criticism of the *Joyce* rule and specifically overruled the case.

In 1990, the FTB issued Notice No. 90-3, announcing that the rule of *Joyce* no longer applied, and that the FTB would implement the decision in *Finnigan.* Neither *Finnigan* nor Notice No. 90-3 specifically discusses retroactive application of *Finnigan,* but the decision was applied retroactively in the *NutraSweet* case. (*Appeal of The NutraSweet Company, supra,* [1992-1993 Transfer Binder] Cal. Tax Rptr. (CCH) ¶ 402-524, at p. 27,352.)

The SBE's 1992 decision in *NutraSweet* involved facts similar to the facts of *Joyce.* In *NutraSweet,* sales into California by a Puerto Rico subsidiary of a unitary group were attributed to California for purposes of the sales factor because a part of the group was taxable in California, even though the actual seller was not. The *NutraSweet* decision applied the *Finnigan* rule to tax years 1974 through 1977. The *NutraSweet* rule was in effect and applied to Citicorp in this case when Citicorp filed amended returns seeking refunds.[10]

In summary, under the *Joyce* rule, income is only attributable to California for purposes of the allocation formula if the affiliate generating the income has a nexus in the state. Under *Joyce,* the income of Citibank (South Dakota) would not be attributed to California. Under the *Finnigan/NutraSweet* rule, the FTB, in determining the proportion of the combined income in California, treats all affiliates as a unitary taxpayer and includes income generated in California from affiliate corporations located outside the state if any member of the group is taxable in the state, even though the affiliate itself is not taxable. Citicorp argues that *Joyce* supplies the appropriate rule, while the FTB follows *Finnigan.*

### Finnigan Is Consistent with Unitary Principles

■ Citicorp argues that the result in *Finnigan* twists the unitary method in a manner that allows the state to tax the income of a nontaxpaying entity

---

[10]One month after the trial court in this case filed its judgment, the SBE issued its decision in *Huffy.* (*Appeal of Huffy Corporation* (Apr. 22, 1990) [1995-1999 Transfer Binder] Cal. Tax Rptr. (CCH) ¶ 403-031, p. 29,257.) In *Huffy,* the SBE reexamined *Finnigan* in light of its poor reception by other states, and rejected the *Finnigan/Nutrasweet* rule in favor of the *Joyce* rule. "Our *Finnigan/Nutrasweet* interpretation of Revenue and Taxation Code section 25135 remains inconsistent with that of nearly all other states that have comparable legislation and should not be adhered to." (*Appeal of Huffy Corporation, supra,* [1995-1999 Transfer Binder] Cal. Tax Rptr. (CCH) ¶ 403-031, p. 29,261.) In light of the general reliance by taxpayers on the *Finnigan* rule, the SBE determined that its decision to return to the rule of *Joyce* would be applied only on a prospective basis to tax years beginning on or after the date of the *Huffy* opinion.

such as its South Dakota affiliate. However, by considering the California income of Citibank (South Dakota), the FTB is not taxing, but is apportioning income attributable to California. (*Edison California Stores v. McColgan, supra,* 30 Cal.2d 472, 474-475.) Taxes are actually imposed only on the corporations that are subject to California's taxing jurisdiction. Our Supreme Court has approved apportionment formulas as an appropriate method of determining the California income of a unitary group of corporations. (*Ibid.* [parent and 15 subsidiary corporations, only one of which was qualified in California, properly subject to three-part allocation formula].) The United States Supreme Court held that computing income of a unitary business that is allocable to one state by use of a reasonable formula does not result in an impermissible tax on extraterritorial values. (*Id.* at p. 483, citing *Butler Bros. v. McColgan* (1942) 315 U.S. 501, 507 [62 S.Ct. 701, 704, 86 L.Ed. 991]; and *Great Atl. & Pac. Tea Co. v. Grosjean* (1937) 301 U.S. 412, 427 [57 S.Ct. 772, 778, 81 L.Ed. 1193, 112 A.L.R. 293] ["It is not a denial of due process to adjust such license taxes as are here involved to meet the local evil resulting from business practices and superior economic power[,] even though those advantages and that power are largely due to the fact that the taxpayer does business not only in Louisiana[,] but in other states"].)

When a unitary business is established, a taxpayer challenging the FTB's apportionment method must show the "formula allocation method was arbitrary and unreasonable." (*Edison California Stores v. McColgan, supra,* 30 Cal.2d at p. 482.) Although Citicorp argues that *Edison* is irrelevant here because it predates the enactment of UDITPA, the principles of *Edison* apply to Citicorp's argument. Regardless of the date of enactment of the present law, *Edison* is a clear response to Citicorp's claim that consideration of the out-of-state affiliate's California activity results in extraterritorial taxation.[11] "The ascertainment of income by the apportionment method is not necessarily a disregard of the corporate entity nor an extension of the provisions of the statute by implication. Formula allocation is merely a method of ascertaining the true income attributable to the plaintiff's business . . . ." (30 Cal.2d at p. 481.) *Finnigan*'s methodology is consistent with accepted principles of taxation of a unitary business.

*The Finnigan Interpretation of "Taxpayer" Is Not Unreasonable*

Citicorp argues that the trial court stated a "remarkable" proposition without legal support when it upheld the SBE's determination in *Finnigan,*

---

[11]Citicorp argues that *Edison* is irrelevant to a discussion of apportionment rules under UDITPA because *Edison* predates UDITPA. *Edison,* however, discussed a three-factor apportionment formula like that subsequently used in UDITPA. Use of the formula in California dates back to inception of the corporate franchise tax in 1929. (Keesling & Warren, *California's Uniform Division of Income for Tax Purpose Act* (1968) 15 UCLA L.Rev. 655.)

*supra,* [1986-1990 Transfer Binder] Cal. Tax Rptr. (CCH) paragraph 401-653, page 25,242, that the context of section 25135 required the SBE to interpret "taxpayer" as applying to the entire unitary group for purposes of application of the throwback rule in *Finnigan.* The referenced portion of the trial court's opinion discussed the *Finnigan* interpretation of the word "taxpayer" for purposes of section 25135, as referring to the unitary group, rather than the individual affiliate. Citicorp's position is that the sales of its South Dakota affiliate cannot be included in the California portion of the allocation formula because the affiliate is not subject to tax in California.

In *Finnigan,* the SBE considered out-of state sales by a California subsidiary, the opposite of the situation in this case. In *Finnigan,* the FTB had thrown back outbound sales to California because the selling subsidiary was not taxable in the foreign states, even though other members of the group were. The SBE accepted the taxpayer's argument that it should not interpret the throwback rule on a separate company basis when it interpreted the word "taxpayer" in all other instances involving unitary groups to mean all corporations in the unitary group. Citicorp argues that "taxpayer" means a single company and that it was error to assign the South Dakota sales here when the single company making the sale is not subject to tax here.[12]

As the trial court here pointed out, section 23030 provides: "Except where the context otherwise requires, the definitions given in this chapter govern the construction of this part." Thus, although former section 23037 defined "taxpayer" as: "any person or bank subject to the tax imposed under . . . this part," the FTB is free to interpret the term as required by the context of the statute.[13] The reasoning in *Finnigan, supra,* [1986-1990 Transfer Binder] Cal. Tax Rptr. (CCH) paragraph 401-653, page 25,241 which relies on FTB regulations and the purposes of UDITPA provisions, supports the court's and

---

[12]We note that section 25102 provides for treating a unitary group as a single entity: "In the case of two or more persons, as defined in Section 19 of this code, owned or controlled directly or indirectly by the same interests, the Franchise Tax Board may permit or require the filing of a combined report and such other information as it deems necessary and is authorized to impose that tax due under this part *as though the combined entire net income was that of one person,* or to distribute, apportion, or allocate the gross income or deductions between or among such persons, if it determines that such consolidation, distribution, apportionment, or allocation is necessary in order to reflect the proper income of any such persons."

[13]A 1997 amendment to the statute deleted the words "or bank," a change which has no impact on the issues raised herein.

the SBE's construction of "taxpayer" in this context as referring to the unitary group and refusing to throw back sales when any member of the group is taxable in the destination state. The trial court correctly determined that the provisions of UDITPA do not require the state to confine its focus to members of the group that have a jurisdictional nexus to the state when dealing with a hydra-headed corporation with multistate and multinational connections.

*There Is No Conflict with Current, Inc.*

Citicorp contends that by "ignoring" the nontaxable status of Citibank (South Dakota), the trial court's decision is contrary to the holding in *Current, Inc. v. State Bd. of Equalization, supra,* 24 Cal.App.4th 382. *Current, Inc.* has no application here. That decision invalidated a statute that purported to impose a use tax on an out-of-state mail order company based solely on its acquisition by a corporation with substantial California contacts. The *Current, Inc.* case did not involve integrated business operations. The court expressly noted that the parties in that case had stipulated that the two companies " 'did not have integrated operations or management.' " (*Id.* at p. 391.)

Citibank (South Dakota) is not being subjected to a tax in this case. The relevant stipulated fact in this case is that Citicorp and its affiliates, including Citibank (South Dakota) "were conducting a worldwide unitary business during the years in issue, and their combined franchise tax liability must be computed on a unitary basis." The rule applied here results in recognition that the unitary group benefited from sales in California. The decision of the trial court in this case is not contrary to the discussion in *Current, Inc.,* which involved a situation wholly different from an attempt to fairly apportion components of an accepted formula.

*Principles of Uniformity Do Not Require Unanimous Acceptance*

Citicorp maintains that the *Finnigan* rule violates UDITPA principles of uniformity because the Multistate Tax Commission has not followed it.[14] Citicorp also notes that two state courts that have considered the *Finnigan* rule have rejected it. (*Dover Corp. v. Department of Revenue* (1995) 271 Ill.App.3d 700 [208 Ill.Dec. 167, 648 N.E.2d 1089]; *Great No. Nekoosa v.*

[14]The Multistate Tax Commission was created by the Multistate Tax Compact, which was adopted by California in 1974. (§§ 38001, 38006, art. VI.) The commission is granted, among other powers, the power to study state and local tax systems, to make proposals to increase uniformity and simplification, to adopt uniform regulations and, upon request, to perform audits. (§ 38006, art. VI.)

*State Tax* (Me. 1996) 675 A.2d 963.)[15] Citicorp argues that of 23 states that have adopted UDITPA, only three other states (Utah, Indiana and Kansas) follow the *Finnigan* approach by administrative action. (See Table of Jurisdictions, 62 West's Ann. Rev. & Tax. Code (2000 Supp.) foll. § 25128, pp. 294-295 [24 states have adopted the uniform act].)

No doubt, the circumstances identified by Citicorp contributed to the SBE's subsequent decision to return to the *Joyce* rule. (*In re Appeal of Huffy Corporation, supra,* [1995-1999 Transfer Binder] Cal. Tax Rptr. (CCH) ¶ 403-031, at p. 29,261.) However, the mere fact that other bodies and jurisdictions did not follow the *Finnigan* rule is not a valid basis for this court to disregard the considered decision of a constitutionally created quasi-judicial administrative agency. (Cal. Const., art. XIII, § 17.) Adherence to an outmoded rule for the sake of consistency in the face of compelling reasons to change is not a virtue. Valid principled reasons support the rationale of *Joyce* and the rationale of *Finnigan.* In the absence of legislative direction to the contrary, the SBE is empowered to interpret cases before it in a manner that is consistent with the purposes of the state's tax code.

The Legislature has delegated to the SBE the duty of hearing and determining appeals from actions of the FTB. (§§ 19045-19048.) Although the courts "bear ultimate responsibility for construing the statute, we accord great respect to the Board's interpretation." (*City of Gilroy v. State Bd. of Equalization* (1989) 212 Cal.App.3d 589, 597 [260 Cal.Rptr. 723].) Merely pointing to the fact that the FTB's decision in *Finnigan* ultimately proved to be a minority position does not support Citicorp's challenge to the legality or constitutionality of the *Finnigan* interpretation of the relevant statute.

*The Decision in Yamaha Corp. Does Not Require Reversal*

Citicorp urges this court to completely disregard the SBE decision in *Finnigan* based on the Supreme Court's analysis of the weight to be given to the SBE's interpretations of law in *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1 [78 Cal.Rptr.2d 1, 960 P.2d 1031]. In *Yamaha Corp.,* the Supreme Court distinguished the standard of review of the exercise of an agency's quasi-legislative rulemaking function and agency interpretations of the meaning of a statute. A less deferential standard applies to the latter pronouncements. (*Id.* at pp. 6, 11.) Even so, ". . . 'the judiciary, although taking ultimate responsibility for the construction of the statute, accords great weight and respect to the administrative construction. [Citation.]' " (*Id.* at p. 12.)

---

[15]We note that, in both of the cited cases, the arguments of the taxpayers were rejected and the taxing authority's interpretation was upheld.

The *Yamaha* court determined that the weight to be given to an agency's construction of a statute is "situational" and depends on consideration of two categories of relevant factors. (*Yamaha Corp. of America v. State Bd. of Equalization, supra,* 19 Cal.4th at p. 12.) The court referred to factors " 'indicating that the agency has a comparative interpretive advantage over the courts,' and those 'indicating that the interpretation in question is probably correct.' [Citations.]" (*Ibid.*) Focusing solely on the second category, Citicorp argues that the SBE's *Finnigan* decision was incorrect and should, therefore, be rejected by this court.

As noted above, the Legislature has allocated to the SBE the power to hear and determine appeals of franchise tax matters. (§§ 19045-19048.) The agency's expertise in tax matters is not subject to dispute and Citicorp does not disparage it. Citicorp concentrates its argument on factors indicating the decision was incorrect. ■ The main point relied upon is that the FTB took a litigation position against the *Finnigan* result in that appeal. In considering the impact of an agency's theory in litigating a case, the court in *Culligan Water Conditioning v. State Bd. of Equalization* (1976) 17 Cal.3d 86 [130 Cal.Rptr. 321, 550 P.2d 593], noted that little weight would be attached to an argument that was merely a litigating position in a particular matter. (*Id.,* at p. 93, noted with approval in *Yamaha Corp. of America v. State Bd. of Equalization, supra,* 19 Cal.4th at p. 9.)

We give even less weight than usual to the FTB's litigation position in *Finnigan,* because the agency was merely fulfilling its duty to enforce the previous SBE rule of *Joyce.* Arguments in litigation, although they may be enlightening or helpful, do not control our review of the subsequent acts of the agency.

Citicorp highlights the factors for weighing an agency decision listed in the *Yamaha* opinion. Those factors include: ". . . 'the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.' [Citation.]" (*Yamaha Corp. of America v. State Bd. of Equalization, supra,* 19 Cal.4th at pp. 14-15, italics omitted.) Citicorp adds two other factors noted by the court: indications of careful consideration by senior agency officials and evidence the agency has consistently maintained the interpretation in question. (*Id.* at p. 13.) Citicorp argues that because the agency has now abandoned *Finnigan* it was poorly reasoned, inconsistently applied and should be given no weight.

The fact that an agency changes its interpretation of a statute is not evidence that either interpretation was legally impermissible. (*Henning v.*

*Industrial Welfare Com.* (1988) 46 Cal.3d 1262, 1269-1270 [252 Cal.Rptr. 278, 762 P.2d 442].) " 'In the general case, of course, an administrative agency may change its interpretation of a statute, rejecting an old construction and adopting a new. [Citations.] Put simply, "[a]n administrative agency is not disqualified from changing its mind . . . ." [Citation.]' " (*Californians for Political Reform Foundation v. Fair Political Practices Com.* (1998) 61 Cal.App.4th 472, 488 [71 Cal.Rptr.2d 606].) As long as the change is constitutionally and legislatively permissible, an agency would be remiss in not adapting its interpretation of the rules to fit the practicalities and present economic conditions dictating a change.

The SBE and FTB followed *Finnigan I, supra,* [1986-1990 Transfer Binder] Cal. Tax Rptr. (CCH) paragraph 401-653, page 25,241 decided in August of 1988, until the April 1999 decision in *In re Appeal of Huffy Corporation, supra,* [1995-1999 Transfer Binder] Cal. Tax Rptr. (CCH) paragraph 403-031, page 29,257. It represented the SBE's decision in litigation between the FTB and a taxpayer and was supported by convincing reasoning. Finnigan Corporation's California subsidiary made sales into states where Finnigan itself was taxable but the subsidiary was not. The SBE accepted Finnigan Corporation's argument that the FTB was interpreting the word "taxpayer," for purposes of the throw back rule, in a different way than it did all other provisions of UDITPA. The SBE acknowledged the definition of "taxpayer" in section 23037 referred to "any person" but relied on section 23030, which allowed it to vary that definition "where the context otherwise requires." The SBE reviewed FTB regulations under UDITPA and noted that the word "taxpayer" was used in at least two senses, with the most prevalent meaning being the combined unitary group. The SBE concluded that this interpretation was consistent with the unitary theory of apportioning California sales among the members of the group.

We find no legal error in the *Finnigan* approach. (*Barclays Bank Internat., Ltd. v. Franchise Tax Bd.* (1992) 2 Cal.4th 708 [8 Cal.Rptr.2d 31, 829 P.2d 279] [Constitution does not mandate use of any particular method of apportionment so long as method used is not arbitrary].) One decision from Maine referenced *Finnigan* and recognized that authority on this issue was divided. That court chose the opposite interpretation under that state's law. (*Great No. Nekoosa v. State Tax, supra,* 675 A.2d at pp. 965-966.)[16] The SBE decision in *Finnigan* was supported by reference to the relevant statutes and regulations, and a reasoned analysis of the issues. Furthermore, the SBE reconsidered and affirmed its decision in *Finnigan II* and *NutraSweet.* Even

---

[16]The other case cited by Citicorp did not discuss *Finnigan,* but determined that the term "taxpayer" did not refer to the unitary group, but to the individual seller. (*Dover Corp. v. Department of Revenue, supra,* 648 N.E.2d 1089.)

in *In re Appeal of Huffy Corporation, supra,* [1995-1999 Transfer Binder] Cal. Tax Rptr. (CCH) paragraph 403-031, where the SBE eventually determined it should abandon the *Finnigan* rule, the SBE did not conclude that *Finnigan* was legally deficient. In *Finnigan II* the SBE noted scholarly criticism of *Joyce* and determined that changes in the interpretation of federal law since *Joyce* led to the decision in *Finnigan.* At that time, the SBE believed that the *Finnigan* rule, if accepted by other states, would be the fairer method and would promote uniformity among the jurisdictions. (*Finnigan II, supra,* [1986-1990 Transfer Binder] Cal. Tax Rptr. (CCH) ¶ 401-797, p. 25,755.)

Justice Holmes often said that the life of the law is experience. By the time of the *Huffy* decision, the SBE had approximately nine years of experience since *Finnigan II* in which to evaluate the operation of that rule. The SBE noted that, contrary to its expectation, *Finnigan* had not been met with universal acceptance. The FTB recognized that *Finnigan* remained a minority rule, which was contrary to the goal of uniformity and in fact, allowed the possibility of exposure to double taxation. (*In re Appeal of Huffy Corporation, supra,* [1990-1995 Transfer Binder] Cal. Tax Rptr. (CCH) ¶ 403-031, p. 29,257.) The FTB correctly stated that there were "theoretically good reasons for the initial implementation of the *Finnigan/NutraSweet* rule," but that the actual implementation did not result in the expected uniformity. Thus, after reviewing the state of the law in the years intervening between its decisions, the SBE returned to the *Joyce* rule without finding legal flaws in the *Finnigan* rule.[17] *Finnigan* simply did not withstand the test of time.

We find the SBE's decisions to be thorough and reasoned. The SBE launched the *Finnigan* rule in the expectation that it would be widely accepted. It adhered to the rule for over nine years, subsequently reevaluated its position in light of relevant intervening legal developments and changed its mind. All decisions were arrived at in an adversary forum, which presumes the existence of vigorous advocacy and careful consideration by a quasi-judicial decision maker. There is no reason to reject the application of *Finnigan* merely because the SBE has recognized that the passage of time did not result in its expected acceptance by other states.

*Application of Finnigan to Citicorp's Return*

 Citicorp argues that we must order the FTB either to apply *In re Appeal of Huffy Corporation, supra,* [1990-1995 Transfer Binder] Cal. Tax Rptr. (CCH) paragraph 403-031, page 29,257 retroactively or prevent it from

---

[17]The original decision in *Huffy* contained a footnote to the effect that California was "improperly" taxing some income under the *Finnigan* rule. This footnote was deleted in the opinion denying rehearing (Sept. 1, 1999) in that case. (Compare *In re Appeal of Huffy Corporation, supra,* [1990-1995 Transfer Binder] Cal. Tax Rptr. (CCH) ¶ 403-031, p. 29,257 with opn. denying rehg., *id.* ¶ 403-052, p. 29,369.)

applying *Finnigan* retroactively to assure treatment under the rule of *Joyce* for Citicorp's taxes.[18] *Finnigan* and *NutraSweet* did not discuss the retroactivity of the decision, but it is undisputed that the FTB, pursuant to Notice No. 90-3, has applied *Finnigan* retroactively.[19]

According to exhibits produced in the trial court, Citicorp's amended returns, although pertaining to the years 1985 through 1988, were filed in 1992 and 1993, after both *Finnigan* opinions and the FTB Notice No. 90-3. "As the Board notes, a refund case throws open the taxpayer's entire tax liability for the period in question [citation], and the Board may raise issues unrelated to the basis or theory on which the taxpayer is seeking a refund in order to defeat the claim. [Citation.]" (*Title Ins. Co. v. State Bd. of Equalization* (1992) 4 Cal.4th 715, 732 [14 Cal.Rptr.2d 822, 842 P.2d 121].) Thus, the SBE may raise items regarding the taxpayer's return "for the timeframe encompassed in the refund claim period which might be set off against [the taxpayer's] refund claim . . . ." (*Sprint Communications Co. v. State Bd. of Equalization* (1995) 40 Cal.App.4th 1254, 1260 [47 Cal.Rptr.2d 399].) The FTB simply applied the law in effect during the time period in which Citicorp filed the amended returns in accordance with policy and procedures applicable to all reviews.

In general, tax legislation is not retroactive. (§ 23058.) However, section 19503, which states that the FTB "shall prescribe all rules and regulations necessary for the enforcement of . . . [the Bank and Corporation Tax Law, section 23001 et seq.]" also provides that the FTB "may prescribe the extent to which any ruling [or regulation] shall be applied without retroactive effect." Although Notice No. 90-3 is not a formal regulation, it represents an exercise of the FTB's authority to prescribe rules and determine the effect of such rules. At the time Citicorp filed its amended returns seeking a refund, the FTB's position on the application of *Finnigan* was clear.

Unlike legislation, the general rule as to judicial opinions is that they are fully retroactive. The United States Supreme Court stated that in general, civil decisions "must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate

---

[18]We note that although a taxpayer may appeal a decision of the SBE, there is no statutory authorization for the FTB to appeal. The result in *Finnigan* favored the taxpayer, so no appeal was taken. (§§ 19048 [FTB or taxpayer may petition for rehearing of SBE decision], 19382 [taxpayer may bring an action after denial of claim for refund].)

[19]*Huffy* expressly discussed the retroactivity issue and determined that because taxpayers had relied on *Finnigan*, it would be fair to apply the *Huffy* return to the rule of *Joyce* prospectively to income years beginning on or after September 1, 1999. (*In re Appeal of Huffy Corporation, supra,* [1990-1995 Transfer Binder] Cal. Tax Rptr. (CCH) ¶ 403-031, p. 29,257.)

or postdate the announcement of the rule." (*Harper v. Virginia Dept. of Taxation* (1993) 509 U.S. 86, 97 [113 S.Ct. 2510, 2517, 125 L.Ed.2d 74]; *Newman v. Emerson Radio Corp.* (1989) 48 Cal.3d 973, 978-982 [258 Cal.Rptr. 592, 772 P.2d 1059] [noting the "general rule that judicial decisions are given retroactive effect"].) Retroactive application of *Finnigan* was an exercise of the prevailing rule regarding changes in the law.

We reject Citicorp's request that we order retroactive application of *In re Appeal of Huffy Corporation, supra*, [1990-1995 Transfer Binder] Cal. Tax Rptr. (CCH) paragraph 403-031, so that it may benefit from the change that occurred after the trial court's judgment in this case. We find no basis for overturning the SBE's well-reasoned decision on the issue of prospective application of *Huffy*. The SBE relied in its analysis on the factors in *Chevron Oil Co. v. Huson* (1971) 404 U.S. 97 [92 S.Ct. 349, 30 L.Ed.2d 296] in reaching the decision that *Huffy* should be applied only prospectively. Although *Harper* cast doubt on the three-part test set out in *Chevron Oil*, *Harper* involved federal law and noted that state courts had a degree of freedom to "limit the retroactive operation of their own interpretations of state law . . . ." (*Harper v. Virginia Dept. of Taxation, supra*, 509 U.S. at p. 100 [113 S.Ct. at p. 2519].) The *Chevron Oil* factors, as discussed in *Huffy*, support the decision in that case. In *Chevron Oil* the court identified three factors to be considered when dealing with the issue of nonretroactivity. "First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, [citation], or by deciding an issue of first impression whose resolution was not clearly foreshadowed, [citation]." The second factor considers whether in light of the "history . . . purpose and effect" of the rule in question its operation will be furthered or retarded by retrospective application. The third factor weighs "the inequity imposed by retroactive application" and whether it would produce " '. . . substantial inequitable results . . . "injustice or hardship" . . . .' [Citation.]" (*Chevron Oil Co. v. Huson, supra*, 404 U.S. at pp. 106-107 [92 S.Ct, at p. 355].)

The SBE decision in *Huffy* clearly established a new principle of law and overruled past precedent on which taxpayers relied. The history, purpose and effect of the rule indicate an agency attempt to lead a movement to nationwide uniformity that ultimately failed. However, the *Finnigan* rule was adhered to and relied upon for tax planning purposes for the years between *Finnigan* and *Huffy*. Although denying retroactive effect to *Huffy* results in a decreased refund for Citicorp, it is not clear that all taxpayers would benefit from retroactive application. The rule in *Finnigan* itself was advocated by the taxpayer. An undesirable result for one taxpayer is not a basis for

rejecting a reasoned decision of the SBE that examined the broad negative effects of retroactivity.

The SBE merely followed the normal rule of full retroactive application when it decided *Finnigan*. The fact that it made an exception in *Huffy* does not require a special rule for Citicorp. We decline the invitation to adjust the agency's reasoned resolution of the application of its own rules.[20]

*Finnigan Does Not Violate Constitutional Standards*

■ Citicorp argues that the *Finnigan* rule violates the commerce clause, the due process clause and the equal protection clause of the United States Constitution. In discussing an attack on the California three-factor formula for apportionment of the income of a unitary business located in California, the United States Supreme Court noted that the California formula not only met the court's approval, but "has become . . . something of a benchmark against which other apportionment formulas are judged." (*Container Corp. v. Franchise Tax Bd., supra,* 463 U.S. at p. 170 [103 S.Ct. at p. 2943].) In its discussion of a commerce clause and due process challenge to the three-factor formula, the Supreme Court stated the standard that the formula must meet to avoid violation of those constitutional provisions. The first test is one of "internal consistency" which means that "the formula must be such that, if applied by every jurisdiction, it would result in no more than all of the unitary business' income being taxed." (*Id.* at p. 169 [103 S.Ct. at p. 2942].) Citicorp does not argue that the *Finnigan* rule violates the principle of internal consistency.

The only evidence supporting Citicorp's argument was the testimony of its tax counsel. Jeffrey Serether, vice-president and state and local tax counsel for Citicorp and its subsidiaries, testified that he reviewed, but had not prepared, the tax returns filed by the South Dakota affiliate for the four years at issue. He stated that Citibank (South Dakota) "reports a franchise tax for financial institutions" to South Dakota, which it calculates based on a three-factor apportionment formula. (S.D. Codified Laws § 10-43-22.1.)[21] In the four years in question, Citibank (South Dakota) apportioned 100 percent

---

[20]We also decline the suggestion that *Huffy* should be selectively applied to Citicorp. (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 25 [44 Cal.Rptr.2d 370, 900 P.2d 619] [noting United States Supreme Court's rejection of argument that court should consider equities of each case in deciding issue of retroactivity].)

[21]South Dakota has adopted UDITPA. (Table of Jurisdictions 62 West's Ann. Rev. & Tax Code, *supra,* § 25120 at p. 295.) The South Dakota statute provides that financial institutions "engaged in business within and without the state shall be taxed only on such business as is properly apportioned to this state. All net income shall be apportioned to this state by

of its income to South Dakota. There was no further detail regarding South Dakota taxes or filings by Citicorp affiliates.

Citicorp's argument implicates the second factor in the Supreme Court's analysis, that of "external consistency," which means that "the factor or factors used in the apportionment formula must actually reflect a reasonable sense of how income is generated." (*Container Corp. v. Franchise Tax Bd., supra,* 463 U.S. at p. 169 [103 S.Ct. at p. 2942].) "[T]he taxpayer's burden of proof on [the issue of showing a violation of the 'external consistency' test] is 'steep if not insurmountable.' [Citation.]" (*Colgate-Palmolive Co. v. Franchise Tax Bd.* (1992) 10 Cal.App.4th 1768, 1785 [13 Cal.Rptr.2d 761].)[22] There was no evidence indicating that application of *Finnigan* distorted the percentage of income fairly allocable to California. Rather, the evidence reflected the reasonable apportionment of sales generated in California.

Citicorp's constitutional challenges are also based on its contention that *Finnigan* results in exposure to multiple taxation of the income of the out-of-state affiliate. Exposure to duplicative taxation resulting from a lack of uniformity among the states does not present a constitutional issue. The Supreme Court has acknowledged the fact that companies doing business in more than one state may be exposed to different taxing rules. The court recognized the differences that exist between the various states in how taxes are calculated. "[W]hile some States such as Iowa assign sales by destination, 'sales can be assigned to the state . . . of origin, the state in which the sales office is located, the state where an employee of the business making the sale carries on his activities or where the order is first accepted, or the state in which an interstate shipment is made.' [Citation.]" (*Moorman Mfg. Co. v. Bair* (1978) 437 U.S. 267, 278, fn. 13 [98 S.Ct. 2340, 2347, 57 L.Ed.2d 197].) Prevention of such possibilities of duplicate taxation would require adoption of a national uniform code, a task the court found better suited to an exercise of legislative than judicial power. (*Id.* at pp. 279-280 [98 S.Ct. at pp. 2347-2348].) Plainly, the Constitution does not mandate that every state treat every item of income alike and assign the apportionment of sales in a uniform manner.

---

multiplying the net income by a fraction, the numerator of which is the property factor, plus the payroll factor plus the receipts factor, the denominator of which is three." (S.D. Codified Laws § 10-43-22.1.) The receipts factor "is a fraction, the numerator of which is the total receipts of the financial institution in the state during the tax period, and the denominator of which is the total receipts of the financial institution in all the states . . . ." (S.D. Codified Laws § 10-43-25.1.)

[22]On certiorari to the United States Supreme Court, the *Colgate-Palmolive* case was consolidated with *Barclays Bank PLC v. Franchise Tax Bd. of Cal.* (1994) 512 U.S. 298 [114 S.Ct. 2268, 129 L.Ed.2d 244]. The Supreme Court upheld California's method of determining income, rejecting the plaintiff's claim that the method impaired federal uniformity in international trade.

The Supreme Court has stated that the Constitution does not " 'invalidat[e] an apportionment formula whenever it may result in taxation of some income that did not have its source in the taxing [s]tate . . . .' [Citation.]" (*Container Corp. v. Franchise Tax Bd., supra,* 463 U.S. at pp. 169-170 [103 S.Ct. at p. 2942], italics omitted.) An apportionment formula will only be struck down where the challenger proves " 'by "clear and cogent evidence" that the income attributed to the state is in fact "out of all appropriate proportions to the business transacted . . . in that State," [citation] or has "led to a grossly distorted result," [citation].' " (*Id.* at p. 170 [103 S.Ct. at p. 2942].) Citicorp has not sustained this burden.

Although constitutional limits on a state's ability to tax interstate businesses exist, they allow the states "wide latitude" to choose a method of apportionment. (*Moorman Mfg. Co. v. Bair, supra,* 437 U.S. at p. 274 [98 S.Ct. at p. 2345].) The main restrictions on a state's ability to tax are: (1) a minimal connection between the activities of the business and the taxing state; and (2) the "income attributed to the State for tax purposes must be rationally related to 'values connected with the taxing State.' [Citation.]" (*Id.* at pp. 272-273 [98 S.Ct. at p. 2344].) Thus, when a state's method of apportionment represents "a rough approximation of a corporation's income that is reasonably related to the activities conducted within the taxing State," no constitutional violation exists. (*Id.* at p. 273 [98 S.Ct. at p. 2344].) Where the state's method appears to reach only the profits earned in the state, and the taxpayer failed to show that " 'the method of apportionment . . . was inherently arbitrary, or that its application . . . produced an unreasonable result' " the state's action is within constitutional bounds. (*Id.* at pp. 274 [98 S.Ct. at p. 2345].)

There is nothing arbitrary or unconstitutional about assigning Citibank's (South Dakota) credit card sales and transactions actually occurring in California to California. Such an assignment reasonably recognizes the contribution of the state in producing the income of the unitary group. Citicorp has not shown the allocation to California is " ' "out of all appropriate proportions to the business transacted . . . in that State . . . ." ' " (*Container Corp. v. Franchise Tax Bd., supra,* 463 U.S. at p. 170 [103 S.Ct. at p. 2942].)

*Gain from the Sale of Buildings Properly Classified as Business Income*

Citicorp reported gains on the sale of real property in New York and Japan as nonbusiness income, allocated to the situs of the property. The FTB determined that the sales were business income, subject to apportionment

by means of the apportionment formula. (*Robert Half Internat., Inc. v. Franchise Tax Bd.* (1998) 66 Cal.App.4th 1020, 1023 [78 Cal.Rptr.2d 453].)

■ The main thrust of Citicorp's claim that the gains are nonbusiness income is that these sales of corporate property were not made in the regular course of its business of banking. The parties disagree as to whether the transactional test or the functional test is used to determine the nature of nonbusiness income. We note that the issue is presently pending before our Supreme Court. (*Hoechst Celanese Corp. v. Franchise Tax Bd.* (1999) 76 Cal.App.4th 914 [90 Cal.Rptr.2d 768], review granted Mar. 1, 2000, S085091.) The resolution of the issue of whether there are two tests is unnecessary in this case because the questioned gain on sales produced business income under either the transactional or functional test.

■ The nonbusiness income of a unitary business is not apportionable and is allocated according to situs. (§§ 25123-25127.) Nonbusiness income is defined as "all income other than business income." (§ 25120, subd. (d).) The definition of business income is: "income arising from transactions and activity in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations." (§ 25120, subd. (a).)

The "transactional" test of business income is represented by the first part of the statutory definition, regarding income arising from transactions "in the regular course" of business. The "functional" test is derived from the second part of the definition, regarding property acquired, managed and disposed of as "integral parts" of the regular business. (*Robert Half Internat., Inc. v. Franchise Tax Bd., supra,* 66 Cal.App.4th at p. 1024.)[23] In addition, the administrative regulations provide that "income of the taxpayer is business income unless clearly classifiable as nonbusiness income." (Cal. Code Regs., tit. 18, § 25120, subd. (a).)

■ Citicorp argues that there is only a single transactional test of business income and that its sale of corporate realty did not occur in the regular course of its banking business. It also argues that even if there is a separate functional test, the acquisition, management and sale of the properties was not an integral part of its business. ■ Proper characterization of the nature of the income is primarily a factual issue. (*Robert Half Internat., Inc. v. Franchise Tax Bd., supra,* 66 Cal.App.4th at p. 1028.) We

---

[23]In the *Robert Half* case, the parties agreed that there were two tests of nonbusiness income and that the loss at issue would not qualify under the transactional test, so the court was not faced with resolution of those issues. (*Robert Half Internat., Inc. v. Franchise Tax Bd., supra,* 66 Cal.App.4th at p. 1024.)

review the facts relating to the purchase, use and sale of each of the four properties.

In 1961, Citibank, N.A., financed and constructed a 39-story office building at 399 Park Avenue in New York City for the purpose of housing corporate personnel.[24] During the years in issue, it was the corporate headquarters of Citicorp and Citibank. In 1987, Citibank sold floors 17 through 39 of the building as part of a planned restructuring of its real estate holdings. At the time of the sale, personnel of Citicorp affiliates occupied all of the floors, and continued to occupy the floors remaining after the sale. Corporate Realty Services, a department of Citibank that manages premises occupied by Citicorp and its affiliates, managed the building.

In 1907, Citibank purchased a nine-story office building at 55 Wall Street in New York City for the purpose of housing corporate personnel. Citibank financed the acquisition of this building. Personnel of Citibank and affiliate companies occupied three of the nine floors at the time of the 1987 sale of the building. Corporate Realty Services managed the building.

The third building was a 59-story office building in New York City known as Citicorp Center. Citibank financed and constructed the building in 1978 for the purpose of housing Citicorp and Citibank personnel. In 1987, it sold floors 23 through 59 as a part of the restructuring of its real estate holdings. Citibank and its affiliates occupied 28 floors, or approximately 47 percent of the building, at the time of sale and 24 percent of the floors sold. From 1978 until the early 1980's, Corporate Realty Services managed the building. In the early 1980's, Citibank hired an outside agent to manage the building. Portions of the buildings were leased to third parties, including accounting firms and attorneys who did business with the bank. Citicorp characterized all dealings with third parties as "arm's length."

Citibank purchased the fourth property in 1954, consisting of a residential building and undeveloped land in Osaka, Japan. Citibank financed the purchase, and Corporate Realty Services was responsible for managing this property. Corporate personnel used this property when they were in Japan. In 1987, a Japanese branch of Citibank sold the building and land, known as ISU House and the Osaka land. Corporate Realty Services managed the building during the relevant years.

---

[24]The stipulated facts disclose that Citicorp owns 100 percent of Citibank, N.A., which is a "full-service commercial bank that offers a broad range of banking and financial services throughout the world, such as traditional lending, deposit taking, and investment management activities." Citicorp itself is "part of a worldwide financial services organization which serves the financial needs of individuals, businesses, governments and financial institutions throughout the United States and in many other countries."

Additional facts contained in the exhibits produced in the trial court include the fact that Citibank financed the purchase of all of the properties. Corporate Realty Services, in addition to managing the buildings, also had responsibility for leasing office space in the buildings. As noted previously, prior to the sale, Citicorp included costs and income from the properties as business income, reporting the value of the four properties as business property and the income from rentals as business income. The following facts were stipulated to regarding tax treatment of cost of and income from the buildings. "During the income years in issue and prior to the sale of each building, or part thereof, [appellant] included the original cost of the office buildings located at 399 Park Avenue, 55 Wall Street, Citicorp Center and the ISU House and Osaka land in the denominator of the property factors used to determine the portion of [appellant's] business income attributable to California sources. During the income years in issue and prior to the sales of each building, or part thereof, [appellant] also included any rental income and expenses associated with the management of each building in determining [appellant's] business income attributable to California sources."

According to the terms of the transactional test, Citicorp urges that we must look to the nature of the transaction to determine whether it occurred in the regular course of a taxpayer's business. The stipulated facts state that the sales of the properties were parts of a restructuring of Citicorp's real estate holdings. There is no evidence as to how often, or for what purpose, Citicorp was restructuring its real estate holdings other than the fact that the restructuring resulted in sales of four corporate properties in one year. There is no evidence regarding the extent of its real estate holdings. This is not the same situation as the example of a manufacturer who makes a one-time sale of a warehouse. (See, e.g., Keesling & Warren, *California's Uniform Division of Income for Tax Purpose Act* (1967) 15 UCLA L.Rev. 156, 164 (hereafter Keesling).) Citicorp presented no evidence of the frequency, nature or extent of the real estate management activities of Corporate Realty Services. Citicorp argues that the sole function of its real estate management department was to manage property occupied by Citicorp affiliates. However, it references no evidence in the record as to the operations or function of the real estate department, other than the few stipulated facts in the record. The evidence was only that Citibank has a department devoted to management and leasing of real property. The evidence also supports a finding that Citicorp considered the income from the real estate properties to be business income prior to the sale. We conclude from the record in this case that Citicorp, with its separate department that acquires, manages, leases and ultimately sells corporate real property, produces business income when it engages in these transactions.

The Citicorp corporate properties, financed by Citibank, occupied to a substantial extent by its personnel and managed by the realty services department of its wholly owned subsidiary, are integral parts of its business under the functional test. As noted by the trial court, the buildings were constructed or acquired to serve as important locations for Citicorp's operations. Citibank or its real estate department acquired, constructed, financed, managed, leased and eventually sold all of the properties after using them for significant. operating purposes.

We note that the functional test is not concerned with the frequency or extraordinary nature of a sale. Under that test, the gain is business income if the asset disposed of was used by the taxpayer in its regular trade or business operations. The functional test predates adoption of UDITPA and tracks the California definition of unitary income. (*Appeal of Borden, Inc.* (Feb. 3, 1977) [1971-1978 Transfer Binder] Cal. Tax Rptr. (CCH) ¶ 205-616, p. 14,897-57; Keesling, *supra,* 15 UCLA L.Rev. at p. 164.) As illustrated by the commentators, "the sale by a shoe manufacturer of one of its factories is hardly a transaction 'in the regular course of the taxpayer's trade or business' (which is selling shoes, not selling factories), but perhaps the 'acquisition, management and disposition' of the factory was an integral part of the business of making and selling shoes." (Keesling, *supra*, 15 .UCLA L.Rev. at p. 164.)

There can be little argument that Citicorp managed its corporate headquarters, other office buildings and the property in Japan as an integral part of its business. Although Citicorp repeatedly refers to itself as a bank, the stipulated facts indicate that Citibank is a bank, while Citicorp is a "worldwide financial services organization which serves the financial needs of individuals, businesses, governments and financial institutions throughout the United States and in many other countries."

Citicorp lists several cases from other jurisdictions which it argues are well reasoned, were ignored by the trial court, and provide support for its conclusion that a banking company that sells its corporate office can never be assessed for business income on the gain.[25] As noted in the case of *Polaroid Corp. v. Offerman* (1998) 349 N.C. 290 [507 S.E.2d 284, 289],

---

[25]Citicorp argues that the trial court incorrectly found that FTB regulations did not compel business income treatment of the gains. (Cal. Code Regs., tit. 18, § 25137-4-1.) The referenced regulation states that "[a]ll income of banks and financial corporations shall be 'business income' unless the income arises from an investment or activity which is not a banking function." However, the evidence supported a factual determination that these gains arose as a part of the normal business activity of Citicorp group's unitary business operations. Citicorp offered no evidence that maintaining space for personnel was not a part of its banking functions. Citicorp argues that the second referenced regulation would actually

those cases held that only a transactional test exists under UDITPA, and those state legislatures "promptly amended their respective tax statutes to explicitly include the functional test within their definition of business income." Other states have disagreed with the cases relied upon by Citicorp. (See discussion in *Polaroid, supra,* 507 S.E.2d at pp. 290-293; *Texaco-Cities Service Pipeline v. McGaw* (1998) 182 Ill.2d 262 [230 Ill.Dec. 991, 695 N.E.2d 481]; *Nat. Realty & Inv. Co. v. Ill Dept. of Rev.* (1986) 144 Ill.App.3d 541 [98 Ill.Dec. 802, 494 N.E.2d 924, 932] [under the functional test, all gain from the disposition of a capital asset is business income if the asset disposed of was "used by the taxpayer in its regular trade or business operations"]; *Ross-Araco v. Com., Bd. of Fin. & Rev.* (1996) 544 Pa. 74 [674 A.2d 691] [if asset produced business income while it was owned by the taxpayer, gain on sale is business income].) Regardless, the record in this case establishes that the income from the sale of the properties derived from corporate activities satisfies either test in California.

*Consideration of Gains on Sale of Office Buildings Is Constitutional*

In two short paragraphs, citing *Allied-Signal, Inc. v. Director, Div. of Taxation* (1992) 504 U.S. 768, 787-789 [112 S.Ct. 2251, 2263-2264, 119 L.Ed.2d 533] and *ASARCO Inc. v. Idaho State Tax Comm'n* (1982) 458 U.S. 307 [102 S.Ct. 3103, 73 L.Ed.2d 787], Citicorp asserts that the inclusion of gains from the sale of the buildings in the apportionment formula is unconstitutional. It contends that because Citicorp personnel did not occupy all portions of the buildings, the proceeds of the sale could not have been operational but must have been for investment purposes. Citicorp did not produce any evidence on this point other than the percentage of occupancy by Citicorp personnel. The fact remains that its property management division rented out portions of the buildings and that Citicorp claimed the rental income as business income. It does not appear that Citicorp attempted to separate out the various portions of the buildings when it initially reported them as business income prior to the sales.

*Allied-Signal* did not involve the sale of corporate real estate but concerned a gain realized on the sale of a corporate taxpayer's shares of stock,

require business income treatment. FTB regulation No. 25120(c)(2) contains several illustrative examples of what may differentiate business from nonbusiness income. (Cal. Code Regs., tit. 18, § 25120, subd. (c)(2).) Citicorp argues that it should get special treatment for the floors of the buildings it did not occupy. The examples do not help Citicorp. One states that a manufacturing plant that is continuously used in the business and subsequently sold generates business income. One of them posits a taxpayer's manufacturing plant that is closed, put up for sale, and rented out while being held for sale. The rental income and the gain on the sale were business income. (Cal. Code Regs., tit. 18, § 25120, subd. (c)(2), examples B-D.) The examples in the regulation do not require reversal of the judgment.

originally purchased in the open market, in an unrelated New Jersey company. (504 U.S. at pp. 774-775 [112 S.Ct. at pp. 2256-2257].) The court considered the question of whether, by including the gain on the sale of stock as having been earned in the unitary business, New Jersey violated constitutional limitations on taxing value earned outside its borders. The court concluded that the activity at issue had no connection with the State of New Jersey and was completely unrelated to the unitary business. The court held that such capital transactions must "serve an operational rather than an investment function." (*Id.* at p. 787 [112 S.Ct. at p. 2263].) The court explained: "It remains the case that '[i]n order to exclude certain income from the apportionment formula, the company must prove that "the income was earned in the course of activities unrelated to [those carried out in the taxing] State." ' " (*Ibid.*)

Similarly, *ASARCO Inc. v. Idaho State Tax Comm'n, supra,* 458 U.S. 307, concerned gains from the sale of stock and dividends from subsidiaries which had no unitary business relationship with the taxpayer. The court merely accepted the proposition that if assets are part of the unitary business, the income from those assets may be treated like any other business income. It refused to allow consideration for tax purposes of dividend income " '[w]here the business activities of the dividend payor have nothing to do with the activities of the recipient in the taxing State . . . .' " (*Id.* at p. 327 [102 S.Ct. at p. 3115].)

The principles discussed in the cited cases impose no limits on the disposition of a corporate headquarters and other corporate properties by a wholly owned subsidiary of the unitary business. " 'The general rule, applicable here, is that a taxpayer claiming immunity from a tax has the burden of establishing his exemption. [¶] 'This burden is never met merely by showing a fair difference of opinion which as an original matter might be decided differently. . . . Of course, in constitutional cases, we have power to examine the whole record to arrive at an independent judgment as to whether constitutional rights have been invaded, but that does not mean that we will re-examine, as a court of first instance, findings of fact supported by substantial evidence.' [Citation.]" (*Container Corp. v. Franchise Tax Bd., supra,* 463 U.S. at pp. 175-176 [103 S.Ct. at pp. 2945-2946], italics omitted.)

The corporate office buildings in this case were not held as separate assets unrelated to the unitary business. Citicorp has not shown that the occupation and use of its office buildings had no connection to the California aspects of its multistate business. Citicorp included the costs and the income from all of the properties as business income prior to the sale. Inclusion of the gain from

disposition of the properties is consistent with the stated constitutional limits on a state's taxing authority. The disposition of the real estate was stipulated to be a part of Citicorp's restructuring of its real estate holdings, a program that was not described further. Based upon the foregoing, the FTB's decision to categorize the capital gains as business income is reasonable, within constitutional limits and is supported by the evidence.

## CONCLUSION

Because the trial court's findings are supported by substantial evidence and the implementation of the rules was a valid exercise of the interpretive powers of the SBE, the judgment is affirmed.[26]

Strankman, P. J., and Stein, J., concurred.

A petition for a rehearing was denied November 1, 2000, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied January 10, 2001.

---

[26]Appellant's request for judicial notice is granted. The documents therein and the referenced web site of the Franchise Tax Board were reviewed but were not useful in the analysis of the issues raised on appeal. The court recognizes that the Franchise Tax Board documents submitted disclose an intent to return to the rule of *Joyce*.